PUGH *et al. v.* GRESSETT.*

(En Banc Oct. 13, 1924. Suggestion of Error Overruled Nov. 24, 1924.)
[101 So. 691.   No. 23833.]

1. FRAUDS, STATUTE OF. *Contract for purchase and sale of corporate stock held taken out of statute by part performance.*

When corporate stock is bought and sold with a position and salary as manager as a part of the consideration, the giving up of the position by one party and the assuming management and control of the business by the other under the agreement is part performance, which takes the case out of the statute of frauds.

2. CORPORATIONS. *Agreement for sale held sufficiently certain, though specific terms of notes to be given in payment not set out.*

Where corporate stock is sold for a fixed price, and a part is to be paid in cash, and part to be carried in negotiable notes by the seller, to be closed by a named date, there is a contract, even though the maturities and specific terms of notes are not set out. In such case the customary dealings may be looked to, and in

such case the seller agrees to take negotiable notes, and the buyer agrees to make and deliver them to the seller in such form and terms as will make them negotiable. The buyer cannot take possession of the business which he gets charge of by the agreement and refuse to carry out his part of the contract.

SYKES, J., SMITH, C. J., and COOK J., dissenting.

---

*Headnotes 1. Frauds, Statute of, 27 C. J., section 429; 2. Corporations, 14 C. J., section 1052.

APPEAL from chancery court of Lauderdale county.

HON. G. C. TANN, Chancellor.

Action by J. B. Gressett, Jr., against T. N. Pugh and others. From a judgment for plaintiff, defendants appeal. Affirmed.

*Wells, Stevens & Jones,* for appellant.

I. EQUITY WILL NOT ENTERTAIN A BILL FOR SPECIFIC PERFORMANCE OF THE SALE OF CHATTELS INCLUDING STOCK IN A PRIVATE BUSINESS CORPORATION OF THIS NATURE. Mr. Pomeroy says: "The doctrine is equally well settled that equity will not in general decree the specific performance of contracts concerning chattels because their money value recovered as damages will enable the party to purchase others in the market of like kind and quality." *Aston* v. *Robinson,* 49 Miss. 348; *Daniel* v. *Frazer,* 40 Miss. 507; *Rimes* v. *Rimes,* 152 Ga. 721, 111 S. E. 34, 22 A. L. R. 1030; *Scottish Union & National Ins. Co.* v. *Warren-Gee Lumber Co.,* 104 Miss. 636, 61 So. 310. Our court in *Aston* v. *Robinson, supra,* said of the action for specific performance; "Ordinarily it will not be exerted in reference to agreements about chattels because the law esteems that ample compensation can be made in damages for a breach."

II. THERE WAS IN FACT NO AGREEMENT BY APPELLANT HOWARD TO PURCHASE THE STOCK. *Yazoo & Miss. Valley R. R. Co.* v. *Jones,* 114 Miss. 787; *Pioneer Box Co.* v. *Price Veneer & Box Co.,* 132 Miss. 189, 96 So. 1003.

III. CONCEDING BUT ONLY FOR ARGUMENT THAT EQUITY WILL MAINTAIN IN ANY EVENT A BILL FOR SPECIFIC PERFORMANCE OF A CONTRACT FOR THE SALE OF CORPORATE STOCK, IT WILL NOT DO SO WHERE THERE IS EITHER FRAUD, MISREPRESENTATION, OR MUTUAL MISTAKE, OR WHERE THE CONTRACT, IF ENFORCED, WOULD BE INEQUITABLE. 4 Pomeroy, pars. 1404, 1405, footnotes on p. 3339; *Daniel* v. *Frazer,* 40 Miss. 507; *Aston* v. *Robinson,* 49 Miss. 348; *Nalty* v. *Cohn,* 117 Miss. 190; *Cathcart et al.* v. *Robinson,* 5 Peters, 8 L. Ed. 120.

IV. THE ALLEGED CONTRACT IS UNENFORCEABLE BECAUSE WITHIN THE STATUTE OF FRAUDS.

V. THE ALLEGED CONTRACT IS UNENFORCEABLE BECAUSE LACKING IN MUTUALITY. Pomeroy, par. 1405; Williston on Sales, par. 55, 103; *Coldblast Transportation Co.* v. *Kansas City Bolt & Nut Co.,* 11 Fed. 77, 57 L. R. A. 696; *Pantages* v. *Grauman,* 112 C. C. A. 61, 19 Fed. 317; *Ryan* v. *McLane,* 91 Md. 175, 50 L. R. A. 514; *Deitz* v. *Stephenson,* 51 Ore. 596, 95 Pac. 803; *Strasburg R. Co.* v. *Echpernacht,* 21 Pa. 220, 60 Am. Dec. 49; *Chilhowie Iron Co.* v. *Gardner,* 79 Va. 305; *Hissam* v. *Parrish,* 41 Va. 686, 56 Am. St. Rep. 892, all of which involved a contract for the sale of corporate stock; *Jutte & Co.* v. *Pfeil,* 219 Pa. 520, 69 Atl. 59; *Ryan case above,* 50 L. R. A. 514, Am. St. Rep. 438; *Thompson* v. *Harcourt* (1722), 1 Bro. P. C. 193, 1 Eng. Reprint 508; *Jones* v. *Newhall,* 115 Mass. 244, 15 Am. Rep. 97; *Hissam* v. *Parrish,* 41 W. Va. 686, 56 Am. S. Rep. 892; *Cowles* v. *Whitman* (Conn.), 25 Am. Dec. 60.

VI. ADDITIONAL AUTHORITIES ON THE GENERAL PROPOSITION THAT APPELLEE WAS NOT ENTITLED TO ANY RELIEF BECAUSE HE DID NOT COME INTO A COURT OF EQUITY WITH CLEAN HANDS, AND THE CONTRACT SOUGHT TO BE ENFORCED IS NOT ONLY VOID FOR INDEFINITENESS BUT IS UNCONSCIONABLE.

*Hafner* v. *Dobrinski,* 54 L. Ed. 277; *Pope Mfg. Co.* v. *Gormully,* 144 U. S. 224, 236, 36 L. Ed. 414, 419, 12 Sup. Ct. Rep. 632; *Cathcart* v. *Robinson,* 5 Peters, 264, 276, 8 L. Ed. 120, 124; *Mortlock* v. *Buller,* 10 Ves. Jr. 292; *Day* v. *Newman,* 2 Cox Ch. Cas. 77; *Hennessy* v. *Woolworth,* 128 U. S. 438, 442, 32 L. Ed. 500, 501, 9 Sup. Ct. Rep. 109; *Nickerson* v. *Nickerson,* 127 U. S. 668, 32 L. Ed. 314, 8 Sup. Ct. Rep. 1355; *Rudisill* v. *Whitener,* 15 L. R. A. (N. S.) 81, 25 R. C. L. 44.

VII. Appellee was not entitled to the relief because the stock was subject to an incumbrance largely in excess of its true value. 25 R. C. L. 78; *Summerlin* v. *Fronteriza Silver Mining & Mill Co.,* 41 Fed. 249; *Fry* on Specific Performance, 859; *Watts* v. *Waddle,* 31 U. S., 6 Peters, 391, 8 L. Ed. 438; *Jeffries* v. *Jeffries,* 117 Mass. 184; *Bowen* v. *Vickers,* 2 N. J. Eq. 520, 35 Am. Dec. 516; *Hinckley* v. *Smith,* 51 N. Y. 21; *Walsh* v. *Barton,* 24 Ohio St. 28; *Mayer* v. *Adrain,* 77 N. C. 8; Pomeroy, p. 3339; *Watts* v. *Waddle, supra* (8 L. Ed. 442).

VIII. Even though appellant Howard is mistaken in all of his fundamental contentions and the court should hold that there was a contract and that appellee is entitled to recover, even then the case should be reversed in order that the equities of appellant Howard against both Pugh and Gressett may be declared and enforced.

*Jacobson & Brooks,* for appellant.

I. The decree rendered by the learned court below is upon an alleged contract which the appellee admitted in his testimony had been abandoned and was never consummated. *Tomlin, et al.* v. *Combs, et al.,* 21 So. 782; *Abrams* v. *Allen, et al.,* 109 Miss. 688; *Isler* v. *Isler,* 110 Miss. 419.

II. THE APPELLANT, PUGH, WAS ACTING AS AGENT FOR APPELLEE GRESSETT AND AT HIS DISCRETION TO OBTAIN A PURCHASER FOR THE STOCK IN QUESTION, AND BROUGHT THE APPELLANT, AND HOWARD, TOGETHER, AND WAS NOT A PARTY TO THE ALLEGED CONTRACT.

III. THE BILL SHOULD HAVE BEEN DISMISSED BY THE COURT BELOW, BECAUSE THERE WAS NEVER A MEETING OF THE MINDS ON ACCOUNT OF THE FALSE REPRESENTATIONS MADE BY APPELLEE OF THE INDEBTEDNESS DUE BY THE CORPORATION. We contend that the evidence plainly shows that the minds of the parties never met and no agreement was ever entered into or trade consummated. We, further, contend that the representations made by Gressett were of such character and nature as to give appellants the right to refuse to carry out the proposed trade for the sale of the corporation stock by Gressett. This court has recently so clearly stated the law pertaining to false representations and so thoroughly reviewed and cited the decisions in our state with reference to same, that we think it sufficient to refer to the case of *Alexander et al. v. Meek et al.*, 96 So. 101, in support of our contention, that the decree in this cause should be reversed and a decree rendered in this court dismissing complainant's bill.

IV. THE LEARNED COURT BELOW SHOULD HAVE DISMISSED THE BILL OF COMPLAINT ON THE DEFENSE OF APPELLANTS THAT THE SUIT IS BASED ON A VERBAL CONTRACT, AND IS WITHIN THE STATUTE OF FRAUDS. Section 4779, Code of 1906, section 3123, Hemingway's Code of 1917, note on p. 394, 14 A. L. R.; *Young v. Alexander et al.*, 86 So. 461, 123 Miss. 708.

V. THERE WAS NO CONTRACT IN WRITING FOR THE SALE OF THE STOCK. Section 175, p. 295, 1 Elliott on Contract; *St. Louis & S. F. R. Co. v. Gorman*, 28 L. R. A. (N. S.)

637; *Yazoo & M. V. Railroad Co.* v. *Jones,* 114 Miss. 787; *Pioneer Co.* v. *Price,* 96 So. 103; *Packet Co.* v. *Streuby,* 91 Miss. 211; *Holt* v. *Winfield Bank* (C. C.), 25 Fed. 814; *Abeles* v. *Cochran,* 22 Kan. 410; 31 Am. Rep. 194; *Kimbrough* v. *Davies,* 104 Miss. 722.

*Amis & Dunn,* for appellee.

I.    The facts of the case are so related to the questions of law presented by the assignment of errors, that it seems to us to be more convenient to discuss and consider the pertinent facts under and in connection with the legal questions separately presented and insisted upon.    It is contended in this court that the bill of complaint is one for specific performance and cannot be maintained for the reason that only chattels were involved in the contract, and that equity will not undertake to enforce performance of a contract of a sale of such property, except under certain circumstances.    The equitable rule invoked is well established and we readily agree that if the bill of complaint was purely one for specific performance the decree of the court below is wrong.    But a casual reading of the bill of complaint will suffice to show that neither its averments nor the prayer thereof makes it a bill for specific performance of a contract.    It is perfectly manifest that the case as made by the bill of complaint is simply one for the purchase money due on the sale of a chattel.    Ordinarily actions of this kind are instituted in courts of law and not of equity, and in some jurisdictions the court of equity is without jurisdiction to try the issues incident to a suit to recover the purchase price of a chattel.    This, however, is not the case under section 147 of the Constitution of Mississippi.    We submit that the appellee was entitled to sue for the price agreed to be paid for the stock under the facts and circumstances pleaded and proven on the trial of the case.    It is not unusual for the seller in cases of this character to sue for

damages for a breach of the contract, indeed in some jurisdictions it is held that where the seller has possession of the chattel, or property, that he may not sue for the sale price, but can only sue to recover damages for the breach of the contract. Sedg. on Dam. 282, 337 (6th Ed.); *Smith* v. *Wheeler,* 7 Ore. 49; 2 Par. on Cont., 484; *Lewis* v. *Greider*, 49 Barb. 606; *Pollen* v. *LeRoy*, 30 N. Y. 549; note to *Pate* v. *Rawlston,* 51 L. R. A. (N. S.) 735.

II.   Was the contract of sale void because of any false or fraudulent representations made by the appellee to the appellants which induced them to make the contract? We submit that the allegations of the answer of Howard and his testimony show conclusively that in so far as the negotiations resulting in the purchase of the stock of Mr. Gressett is concerned that he acted for himself personally. For the sake of argument, it might be conceded that Mr. Pugh acted as the agent of Mr. Gressett, still the result would be the same for the reason that the only representation which Mr. Pugh made which it is contended by Mr. Howard to be false was the same identical representation as made in person by Mr. Gressett to Mr. Howard.

This brings us to the question then, as to whether Mr. Gressett made the alleged representation which it is contended was fraudulent and which was a material inducement to the trade. The said alleged false representation was that pending the negotiations Gressett was asked how much the corporation owed, exclusive of amounts due to banks on loans, and that he represented and warranted that the amount would not exceed five thousand dollars. There is no complaint or pretense that Gressett made any false records, statements or representations in any other respect. The testimony on this point is in sharp conflict. Pugh and Howard both testifies substantially that the representation and warranty was made by Gressett while Gressett testified that

he made no warranty as to the amount of such liabilities of the corporation, but simply expressed the opinion that the aggregate of the debts, excluding the amounts due to banks, was five thousand dollars. The issue of fraud and false representation was clear cut. The chancellor found the issue of fact against the appellants. The well established rule is that his findings of fact will not be disturbed by this court unless the court can say that the decree of the chancellor is manifestly wrong. *Starnes* v. *Nations,* 97 So. 881; *Aetna Ins. Co.* v. *Robertson,* 131 Miss. 343; *Davies* v. *Richardson,* 45 Miss. 499.

III. We desire to respectfully submit to the court that if Gressett had made a warranty that the current commercial debts of the corporation did not exceed five thousand dollars that this would not constitute any ground or reason, under the record in this case, for a rescission of the contract of the purchase and sale of the stock: (1) Because under such warranty Gressett could be held and ought to be held to make it good by suffering a ratable deduction from the amount of the purchase price agreed to be paid for the stock; and (2) that under the record such warranty or representation could not be said to be so material as to justify a repudiation of the contract. As above stated the only thing of which the appellants complained is that Gressett represented that the current commercial liabilities did not exceed five thousand dollars, whereas they amounted to twelve thousand dollars, the difference being seven thousand dollars. It appears from the audit of Mr. Lewis E. Crook that the total assets of the corporation were carried on the books of the company at fifty-five thousand dollars. There were admitted liabilities, on the appellant's theory of the facts, of thirty-six thousand dollars. The stock was being sold on the basis that the capital stock of the corporation was worth fifty thousand dollars, notwithstanding the difference between the known

assets and the known liabilities was only twenty-eight thousand dollars. It is perfectly manifest that all of the parties took into consideration the character of the business, its good will and prospects and the earning power of the corporation and were not looking, exclusively, to its assets and liabilities in arriving at a fair purchase price to be paid for one-fifth of its corporate stock.

IV. It is next contended that the contract for the sale of the stock is non-enforceable because it was not in writing and is therefore void under the statute of frauds. *Willis* v. *Ellis,* 98 Miss. 197; *Bonds* v. *Lipton,* 85 Miss. 209.

V. It is further contended that the appellee abandoned the original contract, by making another contract, and therefore he cannot enforce the abandoned contract. It is sufficient to say by way of reply to this contention that the position assumed is not supported by the facts. True it is that Gressett and Howard undertook to modify the original contract, but the modification did not become effective for the reason that, as shown by the argument of counsel for one of the appellants, the alleged contract which sought to modify the original agreement is utterly void and unenforceable by either party. And the contention is further without merit for the reason that the appellant Howard testified positively that he did not make the alleged contract modifying the original contract, with any intention of becoming bound thereby. We do not think therefore that any extended discussion of this contention of the appellants is necessary and proper.

VI. It is further contended by the appellants that the decree of the court below should be reversed for the reason that the decree is not responsive to the case as

made by the bill of complaint and proven by the evidence. We frankly confess that we are not able to follow the logic of counsel in their arguments on this phase of the case. The refinements indulged in by them are not in keeping with the rule of practice which requires that the plaintiff shall allege his cause of action in plain, in-telligible terms without resort to technical niceties, and that his evidence shall prove or tend to prove his cause of action as stated in his pleadings. The bill of com-plaint in this case states a simple cause of action in favor of the appellee against the appellants. The ap-pellants joined issue with the appellee by filing an answer to the bill of complaint. The testimony if believed, and if legally competent, fully supports the allegations of the bill. Neither is it true as contended by the appellants, that the appellee abandoned the case as made by the orig-inal bill during the progress of the trial. When he found that one of the appellants, was insisting that another and different contract was made from that upon which suit had been brought, he requested the court (whether ad-visedly or not), to amend his bill of complaint, but the court did not permit him so to do, and the case there-fore was left and proceeded with just as it was when the trial begun.

*Cassedy & Potter,* for appellee.

I. ON THE QUESTION OF SPECIFIC PERFORMANCE. In the case at bar, at the time the sale of the appellee's stock to appellants was made, the contract on the appellee's part was to a large extent performed. As a result of the contract he surrendered to the appellants the posses-sion, custody and management of the property. In carrying out his contract he gave up the salary of three hundred dollars per month he was receiving, and gave up his position as acting manager of the corporation, and since that time the appellants have been in the active

control and enjoyment of the property and business of the corporation. We submit that with the stock tendered in court; with the contract thus completed by the appellee that the case at bar was to all intents and purposes merely a suit for damages. Were it decided that this case is a suit for damages, the chancery court having taken jurisdiction even erroneously, it would not be reversed on that account alone. Section 147, Constitution of Mississippi 1890; 25 L. R. A. 110; *Baumgartner* v. *Leavee,* 12 L. R. A. 777.

II. WAS THERE IN FACT AN AGREEMENT? On page two of this record there is set out the evidence of Mr. Gressett, and Mr. Gressett swore positively that he agreed to sell, and that the appellants agreed to buy his stock in the Chero-Cola Company for the sum of ten thousand dollars. In other words, Mr. Gressett testified directly, positively and unequivocally that he sold his stock in the Chero-Cola Company to the appellants for the sum of ten thousand dollars, not only this but in so far as Mr. Gressett was concerned the contract was fully performed. He turned over to the appellants the management and control of the business, delivered to them the property, gave up his salary and tendered to them in court his shares of stock. The facts were resolved by the chancellor in the appellee's favor, and we submit that the evidence offered by the appellee was abundant and unquestionably sufficient to show that the minds of the parties met and that there was a distinct contract entered into.

III. WAS THIS CONTRACT WITHIN THE STATUTE OF FRAUD? We submit that this contract was not within the statute of frauds for in the first place it is evidenced by the signed letters and telegrams of Mr. Pugh and the evidence shows that Mr. Pugh was authorized to sign for both himself and Mr. Howard. The letter dated Sep-

tember 30, 1922, which is set out in the statement of facts above was handed to Mr. Gressett by Mr. Howard himself and is signed by Mr. Pugh. Where the buyer of corporate stock takes possession of the property of a corporation and operates it, there is evidence justifying a jury in finding an acceptance of the stock. 27 C. J. 246; *Davis Laundry Co. v. Whitmore,* 92 Ohio 1100, N. E. 518; 1917C Ann. Cas. 988.

IV. DID THE APPELLEE GO INTO A COURT OF EQUITY WITHOUT CLEAN HANDS? The record in this case does not show that the appellee was guilty of any wrongdoing or that he comes into a court of equity without clean hands.

V. WOULD APPELLEE BE PRECLUDED FROM RECOVERY ON THE GROUND THAT HIS STOCK WAS ENCUMBERED? It is urged that the appellee should not recover because it is stated that his stock is encumbered. We submit that the appellants would have had first to have put the appellee in default by offering to perform their part of the contract. The appellee testified positively throughout that he was ready, able and willing at all times to perform his part of the contract. Not only this, but to substantiate his claim that he was ready, able and willing to perform his part of the contract with the consent of the bank which held a lien on the stock, he tendered this stock to the appellants in open court and they positively refused to accept same.

VI. WITH REFERENCE TO ANY EQUITIES THAT PUGH AND HOWARD MAY BE ENTITLED TO. We submit that all the facts in this matter are before the court; and if there are any equities to adjust between Gressett, and Howard, or between Pugh and Howard, that this court can adjust such equities without remanding the case.

*Wells, Stevens & Jones,* in reply for appellants.

The briefs already on file on behalf of appellants, in our judgment, sufficiently cover all points presented by this appeal. Learned counsel for appellee have made the best possible justification of an erroneous decree. It is perfectly manifest that the agreement relied on by appellee for the sale of the stock is not in writing, and is not reflected by any telegrams or letters, or sufficient memoranda of any kind. The alleged contract therefore is void. The very bill of complaint charges an oral agreement, and the very purpose of going into equity is to try to surround, or get away from the statute of frauds. No litigant violating the statute of frauds has any standing in a court of equity. Section 3123, Hemingway's Code; *Daniel* v. *Frazier,* 40 Miss. 507.; *Young* v. *Alexander,* 123 Miss. 708, 25 R. C. L. 624; Mech. on Sales, sec. 376; *Shindler* v. *Houston,* 1 N. Y. 261, 49 Am. Dec. 316; *Hinchman* v. *Lincoln,* 124 U. S. 38, 8 Sup. Ct. 369, 31 L. Ed. 337.

In the case at bar there was neither delivery nor acceptance. In the case at bar, there is no suggestion that the lien of the seller has been discharged. The salutary purposes of the statute are well considered in the clear opinion of Judge CALHOON in *Ladnier* v. *Ladnier,* 90 Miss. 475; *Frank & Co.* v. *Eltringham,* 65 Miss. 281; *Rector* v. *Sauer,* 69 Miss. 235.


*Jacobson & Brooks,* in reply for appellants.

The record discloses that all of this transaction was verbal, and without the statute of frauds. The letters and telegrams are so uncertain and indefinite as upon what terms the payment would be made, that they are insufficient to take it out of the statute of frauds. *Willis* v. *Ellis,* 98 Miss. 197; *Frank & Co.* v. *Eltringham,* 65 Miss. 284; *Hewson* v. *Peterman Mfg. Co.,* 51 L. R. A. (N. S.) 398.

In our opinion, there can be no merit in the remark of counsel for appellee, that because of the fact that the chancellor decided in favor of the appellee that this court would not reverse the finding of the chancellor. *Alexander et al. v. Meek et al.,* 132 Miss. 298, 96 So. 101.

Argued orally by *J. Morgan Stevens* and *Gabe Jacobson,* for appellants, and by *Thos. L. Bailey, L. T. Kennedy* and *J. W. Cassedy,* for appellee.

ETHRIDGE, J., delivered the opinion of the court.

The appellee was complainant in the court below and filed his bill against the appellants, alleging that prior to the 1st day of October, 1922, the complainant was the owner of twenty shares of the capital stock of the Meridian Chero-Cola Bottling Company, a corporation under the laws of the state of Mississippi, domiciled and doing business at Meridian, Miss.; that on or about the —— day of September, 1922, the said T. N. Pugh and A. T. Howard agreed to purchase from the complainant the said twenty shares of the capital stock of said company and pay him therefor the sum of ten thousand dollars, four thousand dollars of which purchase price was to be paid upon delivery of the stock, and the remainder of the purchase price to be settled for in the note or notes of the defendants, to be executed in favor of the complainant in negotiable form, and of such dates of maturity as that said notes would pass in the usual channels of banks and banking as negotiable paper. Complainant further alleged that, at the time he entered into said agreement with the defendants, he was a director and officer of said corporation, having the general management and control of its business at its place of domicile, and it was agreed and understood that he was to sever his connection with said corporation, and was to be succeeded in the active management thereof by the defendant A. T. Howard; it

being agreed and understood by and between the parties that the said contract and agreement would be executed and completed between the parties on or by October 15, 1922. Complainant further averred that, after said agreement had been entered into verbally, on the 30th day of September, 1922, complainant received a letter from the defendant T. N. Pugh, as follows:

"September 30, 1922.

"Mr. J. B. Gressett,

Meridian, Mississippi—

Dear Joe: Howard and myself made the trade O. K., and he will be over there Wednesday morning to take charge, and if he wants you to stay with him a few days I will appreciate it if you will. I will be over the latter part of the week, or anyhow by the time Mr. Simpson gets back from his trip, to straighten everything up.

"Yours truly,

"T. N. PUGH."

Later on, to-wit, October 2, 1922, the defendant, T. N. Pugh, wired to complainant the following message:

"Columbus, Miss., October 2, 1922.

"J. B. Gressett, Meridian, Miss.

"Everything O. K. Howard will be there Wednesday morning.

"T. N. PUGH."

Complainant further alleged that the above letter and telegram were written in connection with the agreement between the complainant and the defendants, whereby the defendants were to purchase complainant's said shares of stock in said corporation for the sum of ten thousand dollars, to be paid for as stated, and that complainant was to surrender the control of said business of said corporation to said Howard.

Complainant further alleged that on October 4, 1922, the said Howard, defendant, then being in Meridian for the purpose of taking active charge of the business and management of said plant, and at a time when said de-

fendants had not paid to complainant the purchase price for said stock, complainant had a conversation with said T. N. Pugh by long-distance telephone, said Pugh then being in Columbus, Ga., and complainant being in Meridian, Miss.; the substance and purport of said telephone conversation being that complainant would not surrender the management and control of said corporation unto said Howard without the trade for his stock being fully consummated, and that said Pugh then, during the course of said conversation by telephone, assured complainant that he would be in Meridian in the next few days, and would complete the trade for the said stock, and in order that there might be no misunderstanding or doubt about the matter he would send to complainant on said date a telegram confirming said conversation; said telegram reading as follows:

"Columbus, Georgia, October 4, 1922.

"J. B. Gressett, Meridian, Mississippi.

"Howard comes to Meridian today to take charge of the affairs of the company in line with agreement. Also we are to buy your stock for ten thousand dollars. Terms to be agreed on by October fifteenth.

"T. N. Pugh."

In response thereto complainant sent said Pugh the following telegram:

"Meridian, Miss., Oct. 4, 1922.

"T. N. Pugh, Montgomery, Alabama.

"Telegram received. I confirm sale twenty shares Meridian Chero-Cola Bottling Company stock to you for ten thousand dollars. Terms and payment to be arranged negotiable by October fifteenth.

"J. B. Gressett, Jr."

Compainant further alleges that A. T. Howard was then present at Meridian at said Chero-Cola plant, and was fully advised of all that was transpiring between the complainant and the defendant Pugh, and fully agreed on his part to all the terms and conditions of said trade,

and assured complainant that the purchase price agreed upon between the parties for the said twenty shares of capital stock would be paid as soon as A. D. Simpson, the vice-president of the First National Bank of Meridian, returned home; he then being absent, and it being thought he would return to Meridian prior to October 15, 1922; that compainant being thus assured that the defendants were acting in good faith with him, he in good faith surrendered to the defendants, A. T. Howard and T. N. Pugh, full control and management of said Meridian Chero-Cola plant, and surrendered his position and office as general manager and superintendent, and that in a few hours thereafter the defendants began to be contentious about the trade and insisted that complainant should accept less than ten thousand dollars. Complainant then avers he was induced to surrender the control and management of said corporation by said conduct of the defendants and their agreement to pay to complainant the sum of ten thousand dollars in the manner hereinbefore set out.'

Complainant further avers that defendants took into their possession and began the active control and management of the affairs of said corporation as an integral part of their agreement to pay to him the sum of ten thousand dollars for said capital stock. He further avers that they failed and refused to pay to complainant the said sum of four thousand dollars in cash, and refused and neglected to execute their notes for the balance of the purchase price of said capital stock, or do anything towards carrying out said agreement, save the taking over from him of the active control and management of the business affairs of the corporation. Complainant further avers that, notwithstanding the agreements and obligations of said defendants, and notwithstanding the 15th day of October, 1922, had passed, said defendants and neither of them had paid to complainant the sum of four thousand dollars in cash, or any part thereof, or

tendered to him their negotiable notes for the sum of six thousand dollars, or for any other sum. Complainant further avers that he tendered performance of said contract in full on his part, and has actually performed part of said contract by surrendering to said defendants the entire management and control of the affairs of said corporation, and has been and is now ready, willing, and able to deliver to defendants a complete and perfect transfer of said twenty shares of the capital stock in said Meridian Chero-Cola Bottling Company, and hereby tenders full performance of each and every part of said agreement which he is required by the terms of said agreement to perform, and prays that defendants be summoned to answer the bill, and that on final hearing the court will render a decree in favor of complainant and against defendants for the sum of ten thousand dollars and all costs, and prays for general relief.

The defendants answered the bill and admit that prior to the 1st day of October, 1922, the complainant was the owner of said twenty shares of capital stock as alleged in the bill, admit also that complainant was a director and officer of said company, and had entire control and management of said business at its said place of domicile, and aver that complainant kept all the books of said corporation, and was fully familiar with and well knew the financial condition and *status* of said corporation, and knew the indebtedness due by said corporation, and was fully informed as to all of the financial circumstances, condition, and *status* of said corporation on and prior to and during the months of September and October, 1922, and well knew such condition for a long time prior thereto. Defendants further charge that complainant was the only officer and stockholder of said corporation, having entire charge of said corporation, attending to its affairs in the city of Meridian, and aver that neither of the defendants knew of the condition of said corporation as to its financial *status,* and what it owed, and what was due

and owing said corporation at the beginning of the negotiations for the sale of complainant's said twenty shares of stock in said corporation. Defendants deny that they or either of them purchased of the complainant his said twenty shares of stock in said corporation as averred in the bill of complaint.

Defendant Pugh represents unto the court that the facts and matters concerning said negotiations averred by the complainant, Gressett, were not as stated in the bill of complaint, but charges that on the ——— day of September, 1922, the said complainant approached the defendant Pugh and told him that he was anxious to sell his twenty shares of capital stock in said corporation, and that, if said Pugh could get him a purchaser, he would retire from the control and management of said corporation; that said Pugh then entered into conversation with complainant regarding the sale of said stock, and upon inquiry from said Pugh the complainant represented and warranted that said corporation did not owe exceeding five thousand dollars for merchandise, supplies, equipment, etc., and that same was the total amount owed by said corporation, exclusive of the amount that the corporation owed to banks for borrowed money; that the defendant Pugh, although president of said corporation, resided in Montgomery, Ala., and was not familiar with the financial condition of said corporation, as the same was entirely intrusted to the complainant, and, having confidence in the complainant, the defendant Pugh believed all that complainant told him with reference to the financial condition of said corporation; that upon these warranties and representations the said Pugh told the complainant in good faith that he thought he could probably get the defendant A. T. Howard to buy the stock and assume control of the plant, and that he would take the matter up with the defendant Howard, who was then living at Columbus, Miss.; that the defendant Pugh relied entirely upon said representations and warranties,

and made no investigation as to the financial condition of said corporation, and shortly thereafter went to Columbus, Miss., to see the defendant Howard, with a view of communicating to him the representations and warranties of the complainant, Gressett, and the offer of the the said Gressett to sell his said capital stock in said corporation for the sum of ten thousand dollars upon said representations and warranties of the financial condition of said corporation; that the defendant Pugh did go to Columbus, Miss., and communicate with the defendant Howard and in said communication he stated that Gressett offered to sell his entire twenty shares of capital stock in said corporation for ten thousand dollars, and stated to said defendant Howard that the complainant, Gressett, represented and warranted to him that said corporation did not owe an amount exceeding five thousand dollars, that being the total amount of indebtedness due by said corporation for merchandise, equipment, supplies, etc., exclusive of the money borrowed from the banks; that the defendant Howard then agreed to come to Meridian with the defendant Pugh, to have a conference with Gressett, and shortly thereafter did come to Meridian and have a conference with the complainant, and that complainant in the presence of both the defendants offered to sell his twenty shares of the capital stock of the said corporation and retire from the management and control of said business, and did then and there represent and warrant again the financial condition of said corporation as above stated; that thereupon the defendant Howard told the complainant that he and Pugh would go back to Columbus, Miss., as the said defendant Howard wanted to talk the matter over with his sister and brother, and that he would give complainant an answer regarding same after he had talked with them. Thereafter, the defendants relying upon the statements made by the complainant with reference to the financial condition of said corporation, and in the utmost confidence

of said warranties and representations made by said complainant, after they had gone to Columbus, Miss., the defendant Pugh sent the complainant a letter as detailed in said bill of complaint, and sent said telegram as detailed therein.

Defendants further state that on the 4th of October, 1922, the defendant Howard came to Meridian, it being the object and purpose of the said Howard at that time to consummate the trade for the said capital stock of complainant upon the representations and warranties made by said complainant, Gressett, as to the financial condition and *status* of said corporation, and he went to the said plant of said corporation and met Gressett, the complainant, and talked with him about the matter, and that complainant again represented and warranted to the defendant Howard that the corporation did not owe exceeding five thousand dollars, that that was all the money said corporation owed exclusive of the money owed to the banks for borrowed money; that complainant further represented and warranted to the said defendant Howard that upon the sale of said stock he, the said Gressett, would retire from the management and control of said business; that after said conference, and without any sale being agreed to or being consummated, the said Howard, defendant, made some investigation in the city of Meridian in regard to the corporation, and upon such investigation became doubtful about the truth of the representations made by the complainant as to the indebtedness due by said corporation, and upon informing the complainant about the same the complainant admitted he had not represented the matter as it was as to the indebtedness, and that said corporation did owe more money than he had represented and warranted as above. It is further alleged in the answer that the complainant well knew that he was making false and fraudulent representations and warranties regarding the financial con-

dition of said corporation as to the debts due and owing by same, for the purpose of misleading and deceiving the defendants and for the purpose of inducing them to buy said capital stock in said corporation, and that complainant at the time was fully aware of the financial condition of said corporation and knew that it owed debts in a sum far in excess of the said amount represented and warranted by him as above set forth.

Defendants allege further that there was no tender of stock by the complainant, nor were any negotiations concluded and trade consummated as averred in the bill of complaint. Defendants further deny any practice of fraud upon the complainant in said transaction, and further deny that complainant put Howard in charge of the plant, and charge as a fact that complainant did not put Howard in control thereof. Defendants further plead the statute of frauds of the state.

There was an application by the complainant to amend, so as to allege a subsequent agreement signed by Howard in the name of the Chero-Cola Bottling Company, by himself as manager, to pay eight thousand dollars for the said capital stock, but the court declined to permit said amendment.

There is considerable difference in the testimony of Gressett, complainant, and the defendants as to the conversations which took place in reference to the said sale, the chancellor in his decree finding for the complainant in the sum of ten thousand dollars, and the complainant's version will have to be accepted by this court as being true and will have to determine the matters as though the facts testified to by him were true, there being such a conflict as in the opinion of the court would make it binding upon this court to accept the findings of fact by the chancellor.

We will first take up the question as to the statute of frauds; it being contended that the writings above set out are insufficient under the law to constitute a con-

tract, because it is claimed by the appellants that the terms of the contract are not sufficiently set forth or agreed upon in the letters and telegrams passing between the parties, and it being further the contention of the appellant that the oral conversations in the negotiations cannot be considered for the purpose of aiding or enlarging the written contract.

After a thorough consideration of the matter the court is of the opinion that the case does not come within the statute of frauds, for the reason that the surrender of the control and management of the plant by the complainant and the acceptance and taking charge by the defendants was such a part performance of the contract as would make the statute inapplicable. It appears from the evidence of the complainant that the corporation had a capital stock of ten thousand dollars and that he bought two-tenths of said capital stock, paying therefor ten thousand dollars, and that he was the manager and had charge under said contract of the affairs of the corporation, and was to receive and did receive, prior to the making of said arrangement, three hundred dollars per month salary therefor. It further appears from his evidence that Mr. Pugh approached complainant about the matter and stated that the parent company at Columbus, Ga., was dissatisfied with the management of the company at Meridian, and that it would not advance further money and advertise the business at Meridian as it was accustomed to do, unless there was a change in the management; that complainant stated to Pugh that in that view he would be willing to sell his stock and surrender the control if he could get fifteen thousand dollars for it; that Pugh stated that the stock was not worth that, and he would not pay it; that complainant then said he would not surrender control without a lawsuit, and that whoever bought the plant or the stock would buy a lawsuit; that after considerable discussion said Pugh said he might interest the defendant

Howard, at Columbus, Miss., in the matter, and afterwards he did go to Columbus, Miss., and take up with Howard the proposition and got Howard interested, and as a result that Howard came down and inspected the plant and agreed to take the proposition. Complainant denies that he represented or warranted that there were no debts in excess of five thousand dollars owing by the Chero-Cola Bottling Company, but avers that he expressed the opinion only that five thousand dollars would cover the amount of indebtedness outside of the amounts due the banks for borrowed money.

It seems to us that the negotiation between the complainant and the defendants was not merely to sell or buy the stock involved, but that one of the considerations, and perhaps the leading consideration, influencing all of the parties was the giving up by the complainant of the management and control as manager, and on the part of the defendants was to procure the control of the plant and business, and to have full control and management thereof, and to eliminate complainant's connection therewith.

The case of *Ford* v. *Howgate,* 106 Me. 522, 76 Atl. 939, 29 L. R. A. (N. S.) 734, illustrates the principle governing in cases like this. In that case it was held that a contract for sale of unissued stock in a corporation and an interest in an automobile was taken out of the statute of frauds by entering into possession of the business with the other owners, carrying it on as contemplated by the contract, and taking and using the automobile as one of the owners. In the opinion the court said:

"It was urged, among other defenses: (1) That the alleged agreement was void under the statute of frauds; and (2) that the plaintiff could not recover without delivery or tender to the defendant of a certificate of the shares of stock. Section 4, chapter 113, Rev. St., commonly known as the 'statute of frauds,' provides: 'No contract for the sale of goods, wares, or merchandise, for

thirty dollars or more, shall be valid, unless the purchaser accepts and receives part of the goods, or gives something in earnest to bind the bargain, or in part payment thereof, or some note or memorandum thereof is made and signed by the party to be charged thereby, or by his agent.' The plaintiff did not contend at the trial that the subject-matter of the contrac of sale, comprising, as he claimed, his ownership of the shares of stock in the corporation and his interest in the automobile, was not 'goods, wares, or merchandise,' within the meaning of the statute of frauds. Such claim, if made, would have been without support in reason or authority. *Pray* v. *Mitchell,* 60 Me. 430.

"But it was the plaintiff's theory that, although the oral contract of sale was within the terms of the statute, nevertheless it had been taken out of the operation and effect of the statute by reason of a compliance with the provisions of the exception that, if 'the purchaser accepts and receives a part of the goods,' the contract is valid and enforceable. Upon this branch of the case the presiding justice instructed the jury 'that although all the right which Mr. Ford had in the business was his shares, it being a corporation, nevertheless it was a corporation in which he was acting as men do with their own property, and he and Mr. Wentworth had been operating it. It was a business, and the sale of the interest in the business gave Mr. Howgate an equitable right to have the stock delivered to him; and if he went into possession of the business under the trade which he claims, and took part in it as owner, it was an executed contract. It was all done; nothing to be done except to pay. And when a contract has been executed and completed—finished—and the parties have gone into the business, carrying it out, then the statute of frauds does not apply.' In respect to the effect of an acceptance and receipt of the automobile by defendant, as claimed by the plaintiff, the presiding justice said: 'And the plain-

tiff claims in this case that the automobile was physically accepted, that is, the defendant Howgate took it into his possession; not into his sole possession; because it was only an undivided interest in an automobile that he bought anyway, but that he took it and used it as one of the owners. If he did, then that would be an acceptance of it, and an acceptance of a part of the whole thing that was furnished—interest in the business and automobile —and that would take it out of the statute of frauds also. So that upon the plaintiff's theory that the defendant made the trade and went into the execution of it by taking the business, or taking his part of the business, the statute of frauds does not apply.'

"Summarizing his instructions as to the statute of frauds as a defense, the justice said: 'And it comes back, so far as those legal defenses are concerned, to the proposition which I stated earlier; that, if the trade was made as the plaintiff claims, the interest in the business and the half interest in the automobile were sold at an agreed price of one thousand dollars and the defendant Howgate entered into the possession of the business with the other man, running it as an owner, carrying it on as contemplated by the contract, and took the automobile in the same way, then he must pay what he agreed, so far as any evidence in this case is concerned.'

"The defendant contends, in support of his exceptions, that the instructions given did not sufficiently distinguish the plaintiff's interest in the business, being only an intangible right of ownership in the shares of stock in the corporation, from an ownership in the physical property of the corporation, and for this reason the jury were permitted to conclude, and naturally did conclude, that if the defendant went into possession of the business of the corporation with Mr. Wentworth he thereby physically accepted and received the plaintiff's 'interest in the business,' which was the subject of the sale, and thereby the exception in the statute was necessarily complied with.

We do not think the instructions are open to that objection. The theory on which they were given is that, because the plaintiff's interest in the business was only the intangible right of ownership of the shares of stock, for which no certificate had ever been issued, the contract of sale gave the defendant all and the same right to the ownership of those shares which the plaintiff before had, no act on the part of the plaintiff remaining to be done, and if the defendant, on his part, accepted that contract, and used and enjoyed the privilege and benefits it was intended to afford him, then the contract became executed, and for that reason the statute of frauds was not applicable to it.''

*Davis Laundry & Cleaning Co. v. Whitmore,* 92 Ohio 44, 110 N. E. 518, Ann. Cas. 1917C, 988, was also a case in which the laundry company was a corporation capitalized at two hundred fifty shares of the par value of one hundred dollars each, of which the plaintiff owned one hundred twenty-six shares, the balance outstanding in the names of other parties. Another laundry company doing a kindred business desired to purchase all of the shares and executed to plaintiff the following memorandum of agreement:

''We agree to purchase one hundred twenty-six shares of Ideal Laundry stock for five thousand five hundred dollars, and the balance of one hundred twenty-four shares at fifty dollars per share, from F. C. Whitmore. [Signed] THE DAVIS LAUNDRY COMPANY, per E. W. SLOAN.''

There was no time fixed for the delivery of such shares, and it was verbally agreed that delivery should be made at a local bank, and that the buyer should assist in obtaining the outstanding shares. On February 21, 1910, the seller had deposited in the bank his own one hundred twenty-six shares and had obtained one hundred sixteen of those outstanding, at which time he notified the defendant of this fact, and that the remaining

eight shares would be delivered in a very short time. On January 31, 1910, the buyer took possession of the plant and assets of the Ideal Laundry Company and operated the same for a period of two weeks. On February 28, 1910, the seller had secured the entire two hundred and fifty shares and deposited them with the local bank for delivery, and so notified the buyer. On February 16, 1910, the buyer yielded possession and repudiated the contract. The plaintiff recovered, and the court affirmed the judgment. The court held that shares of stock were personal property. The court then said (92 Ohio, 52, 110 N. E. 521, Ann. Cas. 1917C, 991):

"The record in this case discloses that the buyer, through its officers, took charge of the kindred laundry company, its plant and all its assets, and operated the same for a period of about two weeks' time or more; that while in the possession and operation of this plant, and at the time they repudiated the contract of purchase, they had knowledge of the fact that all but eight of the two hundred fifty shares of stock were in the possession of the bank ready for delivery, and the remaining eight shares would be available in a very short time.

"Section 8384 (1), General Code, *supra,* provides that verbal contracts 'shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold.' Subdivision 3 of that section provides that 'there is an acceptance of goods within the meaning of this section when the buyer, either before or after delivery of the goods, expresses by words or conduct his assent to becoming the owner of those specific goods.' Under the facts stated it was for the jury to determine whether or not the acts and conduct of the defendant in the possession and operation of the plant were of such character as to show an acceptance under the contract of two hundred forty-two shares of stock that had been deposited with the National Bank of Commerce for delivery to the defendant."

The court then quotes the above case of *Ford* v. *Howgate,* 106 Me. 517, 76 Atl. 939, 29 L. R. A. (N. S) 734, and says:

"In the absence of time stipulated in the agreement for the delivery of shares of stock, the plaintiff had a right to a reasonable time to procure such delivery. By its letter of February 16, 1910, the defendant undertook to say that they had waited a reasonable time for the delivery of this stock and repudiated the agreement. The question whether the time was a reasonable one or otherwise, at the time of repudiation, was a fact to be determined by the jury under all the circumstances of the case.".

We will next notice the contention of appellants that the complainant's statement that five thousand dollars would cover the indebtedness of the corporation other than money borrowed from the banks was a fraudulent representation or warranty. The complainant's version of the case was the expression of an opinion, and that he did not represent anything to Howard about the matter; that is, that the conversation with Pugh was nothing more than the expression of an opinion, and that Pugh was president of the corporation.

We think it was the function of the chancellor as a trier of facts to determine whether it was a representation or a mere expression of opinion, and it was also his function as a trier of facts to determine whether the complainant made such statements to Howard. The appellants proceed upon the theory that Pugh's admitted representation to Howard was binding upon the complainant, because they insist that Pugh was acting as agent for the complainant in selling the stock to Howard. In our opinion that assumption is not supported by the record. Gressett's testimony and the correspondence show that Pugh and Howard were dealing with Gressett, and not that Pugh was dealing with Howard for Gressett. The chancellor had a right to accept Gressett's

136 Miss.—44.

version of the matter, and if we take his evidence as true it would certainly appear that Pugh was not representing him in the deal. We think the whole transaction shows that Pugh was a joint purchaser in this arrangement with Gressett. It does not clearly appear what the relation between Pugh and Howard was as to each other, but it does appear that they were buying from Gressett, and intended to get rid of Gressett as manager, as well as to secure his stock in the corporation.

We will next take up the contention that there was no contract of meeting of the minds of the parties on any definite terms, so as to make a completed contract. Appellants earnestly insist that there never was any agreement which would constitute a binding contract regardless of the statute of frauds. The testimony shows that Gressett's proposition was that he would take four thousand dollars in cash, and that he would undertake to carry the balance if they could not procure all cash. The defendant Pugh, writing to Gressett in the letter, set out above, says:

"Howard and myself made the trade O. K., and he will be over Wednesday morning to take charge. . . . I will be over the latter part of the week, or anyhow by the time Mr. Simpson gets back from his trip, to straighten everything up."

And in the telegram of October 2, 1922, he says:

"Everything O. K. Howard will be there Wednesday morning."

Then after a conversation over the telephone between Pugh and Gressett, Pugh sent the following telegram on October 4, 1922:

"Howard comes to Meridian today to take charge of the affairs of the company in line with agreement. Also we are to buy your stock for ten thousand dollars. Terms to be agreed on by October fifteenth."

The telegram refers to some agreement, and the contract it refers to is to be in line with the agreement. It

was held in *Mercer Electric Mfg. Co.* v. *Connecticut Mfg. Co.,* 87 Conn. 691, 89 Atl. 909, that the fact that some of the terms of an offer were stated in a conversation would not make the offer indefinite or uncertain, since it was capable of precise ascertainment. Therefore to find out what the agreement was referred to in the telegram we must have recourse to the evidence. In this telegram it is clearly stated that "we are to buy your stock for ten thousand dollars." The amount of the purchase was full and specific; the terms to be agreed on by October 15, 1922. Now, when we refer back to the agreement as disclosed by Gressett's evidence, we get precisely what the terms were; that is, they were to execute their notes for the six thousand dollars. It is true that there is some uncertainty as to exactly how long the notes would run, or precisely how they would be executed, but they were to be carried under the agreement by Gressett. Under this agreement the appellants bound themselves to execute notes, and Gressett bound himself to accept such notes. That was the verbal agreement. Gressett's reply to the telegram. "I confirm sale twenty shares Meridian Chero-Cola Bottling Company stock to you for ten thousand dollars, terms and payment to be arranged negotiable by October fifteenth," shows his interpretation of the contract, and, as that letter was acted upon in taking charge of the plant, we must construe the matter in the light of the evidence and in his telegram of acceptance, and the appellants must be assumed to have acquiesced in this interpretation, because after receiving it they took charge and remained in charge of the business until the filing of the suit.

In 13 Corpus Juris, 268, under the head of "Intention Capable of Ascertainment," it was said:

"If, with the aid of the usual tests and principles of construction, the court is able to ascertain and to enforce the intention of the parties, their agreement will not be held uncertain. So an agreement drawn up by illiterate

persons will not be held uncertain, if it is possible for the court to ascertain their meaning. While a contract, incomplete on its face, may thereby be ambiguous, it is not necessarily void. Absolute certainty is not required. That is certain which may be rendered certain, according to the maxim, '*Id certum est quod cetum reddi potest.*' A promise not in itself certain may be rendered certain by a reference to something certain. An offer to sell goods need not specify the price, for, if no price is stated, it will be presumed that the reasonable market price was intended. And in other like cases, when the terms' are not absolutely certain, it is held that the parties have in effect referred the matter to a court or jury in case they disagree about it themselves.''

In 13 Corpus Juris, p. 271, it is said:

''Section 62. There are many terms not actually expressed in the offer which are implied by law and which are as binding on both parties after acceptance as though actually spoken or written into the contract. A contract, it may truly be said, includes not only what the parties actually write down or say, but all those things which the law implies as part of it, and likewise all matters which both the parties intend to express, but do not.

''Section 63. Every trade, business, or calling has its usages, and persons who make offers relating thereto assume that all the customary incidents of such callings shall be part of the agreement, and hence do not expressly refer to them. Although unexpressed, they are implied terms of the contract; and this is true in the case both of written and oral contracts.''

In case of *Joy v. City of St. Louis,* 138 U. S. 1, 8, 43, 11 Sup. Ct. 243, 34 L. Ed. 843, the supreme court of the United States dealt with a case of a contract between two railroad companies and the city of St. Louis, said agreement being made by the park commissioners on behalf of the city of St. Louis, and said agreements being tripartite agreements between the park commissioners

and the two railroad companies, whereby the right of way through the park was granted to one of the railroad companies, which covenanted to permit other railroads to use such right of way upon such terms and compensation "as may be agreed upon by such companies." It was insisted there that the contract was uncertain because the agreements were thereafter to be made and were not expressed in the contract. At page 251 of the Supreme Court Reporter the court said:

" 'Said party of the second part shall permit, under such reasonable regulations and terms as may be agreed upon, other railroads to use its right of way through the park and up to the *terminus* of its road in the city of St. Louis, upon such terms, and for such fair and equitable compensation to be paid to it therefor, as may be agreed upon by such companies.' It is to be construed in connection with paragraph 12 of the same agreement. In regard to these two paragraphs, the opinion of the circuit court says: 'It will be observed that by the ninth paragraph the county road agreed to permit the use of its right of way by other railroads. Whether a like obligation was assumed by the Kansas road depends upon the last sentence in the twelfth paragraph, which purports to grant to the Kansas road the right to occupy and enjoy the right of way through the park jointly with the County road "on the terms of the said contract between them, and under the same terms and conditions as are hereby and hereinbefore imposed upon said party of the second part, and which are hereby assumed by said party of the third part as to improvements, except as to building a depot and switch in said park, which the party of the second part is to do itself." It must be conceded that the meaning of this language is not perfectly clear. It is claimed by the defendants that the words "as to improvements, except as to building," etc., qualify, not only the immediately preceding clause, commencing "and which are hereby assumed," but also the

one prior, commencing "and under the same terms and conditions," and therefore that the terms and conditions as to improvements are those alone cast upon the Kansas road. This would make the two clauses but a single compound one, qualified by the following relative clause "as to improvements," etc. As against this it must be observed that, grammatically, a relative clause generally qualifies its immediate antecedent, and therefore, in this case, would refer simply to that clause which provides for the assumption by the Kansas road. This natural grammatical construction is strengthened by the punctuation—a comma after the words "party of the second part" and none after the words "party of the third part," which seems to separate the entire first clause from the second and its qualifying terms. I know that the matter of punctuation is never relied upon to defeat the obvious intent; but, when the meaning is doubtful, the punctuation is certainly a matter tending to throw light upon it. Further, there are not simply two, but really three, antecedent clauses, the first one being "the terms of the said contract between them"— that is, the two railroad companies. Very clearly this qualifying clause does not refer to, that, and therefore it should not be held to qualify the second, unless the obvious intent compels such construction. It is objected that the clause commencing "and which are hereby assumed" is, under this construction, superfluous. I think not. These improvements called for the expenditure of money, and the idea seemed to be that the Kansas road should not only hold its rights upon certain conditions, but that, as to those involving expenditure of money, it should expressly assume the performance.' "

At page 255 of the Supreme Court Reporter the court said:

"It provides that the county company 'shall permit' other railroads to use its right of way. This is to be done 'under such reasonable regulations and terms as

may be agreed upon,' and 'upon such terms, and for such fair and equitable compensation to be paid' to the county company 'therefor, as may be agreed upon by such companies.' Not only are the regulations and terms to be reasonable, but the compensation is to be fair and equitable. Although the statement is that the compensation is to be such 'as may be agreed upon by such companies,' yet the statement that it is to be 'fair and equitable' plainly brings in the element of its determination by a court of equity. If the parties agree upon it, very well; but, if they do not, still the right of way is to be enjoyed upon making compensation, and the only way to ascertain what is a 'fair and equitable' compensation therefor is to determine it by a court of equity. Such is, in substance, the agreement of the parties. The provision cannot be construed as meaning that, if the parties do not agree, there is to be no compensation, and that, because there can in that event be no compensation, there is to be no enjoyment of the right of way. In this view, it cannot be said that the court is making an agreement for the parties which they did not make themselves. *Emery* v. *Wase,* 8 Ves. 505; *Milnes* v. *Gery,* 14 Ves. 399; *Gregory* v. *Mighell,* 18 Ves. 328; *City of Providence* v. *St. John's Lodge,* 2 R. I. 46; *Dike* v. *Greene,* 4 R. I. 285."

In the case of *Chesapeake & O. Ry. Co.* v. *Herringer,* 158 Ky. 267, 164 S. W. 948, an agreement was made between the landowner and the railroad company by which the railroad company agreed to put in a crossing for the landowner at a point to be agreed upon by the parties. It was held that this was not void because the element of reasonableness entered into it. At page 270, (164 S. W. 949) the court said:

"The contract is not void because it is provided that the parties are to agree upon the location of the crossing, and Gilkerson is named as a representative of the company, who is to act for it. The third crossing is a part of the consideration for the things granted by the con-

tract, and the railroad company cannot take the privileges granted and withhold the consideration. The substance of the contract is that Herringer is to have the third crossing. Only the location of that crossing is left undetermined. If the parties cannot agree upon an equitable and just location of the crossing, the chancellor must locate it for them. *Slade* v. *City of Lexington,* 141 Ky. 218-221, and cases cited. On the return of the case to the circuit court, it will be transferred to equity, and the court, on the evidence now in the record and such other evidence as either party may offer, will fix the point at which the crossing is to be placed, and give the railroad company a reasonable time to put it in.''

See, to like effect, *Miller* v. *Kendig,* 55 Iowa, 174, 7 N. W. 500; *Worthington* v. *Beeman,* 91 Fed. 232, 33 C. C. A. 475; *Burton* v. *Wells,* 30 Miss. 688.

In *Burton* v. *Wells,* 30 Miss. 688, the plaintiff sued the defendant upon a claim for fifty dollars and judgment was rendered for the defendant, and the plaintiff prosecuted his appeal to the circuit court, where judgment was rendered for the plaintiff below, and from which judgment the case was brought to the court. The facts as stated by the court are as follows: Burton, the defendant below, and Wells, the plaintiff, purchased jointly a tract of land from one Rowe, and paid each on account of the purchase the sum of fifty dollars; Rowe at the same time, made them a deed for the land, and took the notes of each party for the balance of the purchase money. This deed not having been recorded, Burton afterwards proposed to Rowe to make to him (Burton) a deed for the entire tract of land; Rowe agreed to do so if Wells would consent to the arrangement. Wells, being approached on the subject, consented, on condition that Burton would take up the notes given by Wells, and would pay back to Rowe, for the benefit of Wells, the fifty dollars which had been paid. This answer was communicated to Burton, who did not agree to pay back the fifty dollars, but only to

take up Wells' notes. Rowe, however, made the deed
as requested by Burton, which deed he then received.
It is not shown by the evidence what became of the deed
which had been previously made to Burton and Wells.
Upon this state of facts the question for decision is
whether Burton, taking the deed from Rowe, knowing
at the same time the terms prescribed by Wells as the
conditions upon which he (Burton) might take the deed
to himself, must be understood as agreeing to those terms.
It is true that Burton said that he would not pay back
to Wells the fifty dollars which he had paid; and it may
be conceded that as a general rule the law will not imply
a promise, where the party has refused to make an ex-
press promise in regard to the same matter. But here
the promise to pay the fifty dollars was the condition
upon which Wells agreed that the deed might be made
to Burton. His right to the deed depended upon his
willingness to perform the condition, and, if he refused
to perform the condition, he must be understood, at the
same time, as refusing to receive the deed. And the con-
verse of this proposition must be held as equally true:
If he received the deed, he received it with the condition
annexed by Wells, that he (Burton) should pay back the
fifty dollars. He must be understood either as wholly
agreeing, or disagreeing, to the condition. If wholly dis-
agreeing, he, of course, declined receiving the deed; and,
if wholly agreeing, he undertook to perform the condi-
tions annexed by Wells.

So, in the case before the court, the defendants having
accepted the plant and the management thereof, they
must pay the consideration which they agreed to pay.
The defendants could not take charge of the plant and
operate it, refusing to rescind after having knowledge
of the debts which the company owed to restore the *status
quo ante,* and escape their obligation imposed by the
agreement under which they assumed charge and re-
ceived the benefits of the possession and management of
the plant.

There are a number of other points presented, but we do not think they call for a response in this opinion.

The judgment of the court below will be affirmed on condition that the appellee surrenders the shares of stock to the defendants, it appearing that he has offered to do so and they had declined to receive such shares.

*Affirmed.*

Sykes, J. (dissenting).

Section 3123 of Hemingway's Code (section 4779, Code of 1906) provides that:

"A contract for the sale of any personal property, goods, wares, or merchandise, for the price of fifty dollars or upward, shall not be allowed to be good and valid unless the buyer shall receive part of the personal property, goods, wares, and merchandise, or shall actually pay or secure the purchase money, or part thereof, or unless some note or memorandum, in writing, of the bargain be made and signed by the party to be charged by such contract, or his agent thereunto lawfully authorized."

Stocks in corporations are personal property. In this case the negotiations were for the sale and purchase of twenty shares of stock for an alleged price of ten thousand dollars. None of the stock was delivered. All of us agree that the letters and telegrams were insufficient as to the terms and conditions of the sale to constitute a note or memorandum in writing under this statute. Three of the judges, however, think that the turning over of the management of the plant to Howard was a delivery to the buyer of a part of the personal property under this statute. I disagree with this conclusion.

There were one hundred shares of stock of this corporation. The appellant Pugh and his wife owned eighty shares, and the appellee, Gressett, twenty shares. The parent company was dissatisfied with the management

of Gressett. This led to negotiations for a sale of Gresset's stock. It was understood between Pugh and Gressett that, in case Gressett's stock was sold, he was also to retire from the management. The negotiations were not for the purchase of a majority or controlling number of shares of the corporation, but only of a minority number. Pugh and wife could dominate and control any stockholders' meeting with their eighty shares. Gressett received a salary of three hundred dollars a month as manager. The record does not show that he was employed, except by the month. It probably was an inducement to Howard, to purchase this stock, to know that he would be made manager of the plant. It is admitted by both counsel for the appellant and for the appellee that this corporation could not purchase Gressett's stock; therefore negotiation for the sale of this stock were with the individuals, Pugh and Howard. It was an individual transaction among these three men, as contradistinguished from a corporate transaction. Gressett as an individual had no right to sell the position of manager. This position could only be sold or given by the corporation. It was not personal property of Gressett. Had he been wrongfully discharged by the corporation, his cause of action would have been against the corporation, not against Pugh and his wife individually. The cases relied upon in the majority opinion are where either all of the stock or a majority of the stock of corporations was being sold, which necessarily carried with it the right to the control and management of the corporation. The statute of frauds contemplates the delivery of the personal property that the seller either unqualifiedly or qualifiedly owns. Had the corporation been selling this stock, together with the management of the plant, a different question would be presented. I think the opinion of the court in the case of *De Nunzio* v. *De Nunzio*, 90 Conn. 342, 97 Atl. 323, correctly states the rule upon this question.

Aside from the statute of frauds, I do not think that the letters and telegrams, taken in connection with the conversation of these parties, constitute a definite contract for the purchase of this stock, upon which a right of action may be predicated. In addition to the letters and telegrams, we have the testimony of Mr. Gressett, in which he sums up the alleged contract agreed upon as follows:

"The whole conversation was, if they couldn't pay the full amount in cash, they would arrange to pay four thousand dollars in cash, and I was to arrange to carry the balance."

The subsequent negotiations were then evidenced by the letters and telegrams. My view is that this conversation, when considered with these written documents, shows that the minds of the parties never met, first, as to the amount which was to be paid in cash; second, as to how the balance was to be paid, the amount of each payment, and the rate of interest the deferred payments, if any, were to bear; also by whom the notes were to be signed, and whether or not secured, by deed of trust or otherwise.

If I correctly construe Mr. Gressett's testimony, when considered with the letters and telegrams, it was only that they were to make arrangements to pay, if possible, in cash four thousand dollars, but this arrangement was superseded by the letters and telegrams, which only indicate to me that all of this was indefinite and uncertain. It was merely an agreement to make a contract on October 15th; an agreement upon which a cause of action cannot be maintained. This court in the case of the *Yazoo and Mississippi Valley Railroad Company* v. *Jones,* 114 Miss. 787, 75 So. 550, said:

"Where there is no estoppel, the minds of the contracting parties to a contract must meet as to all the terms and conditions of the contract."

In fact, I do not think that the oral tesaimony in the

case at all supplements or helps out the written memo-
randa.   In my opinion there should be a decree in this
case in favor of the appellants.

.Smith, C. J., and Cook, J., concur in these views.