O. MICHELETTI, APPELLANT, *v.* JOHN C. FUGITT, SUBSTITUTED FOR FIRST NATIONAL BANK OF NEVADA, A BANKING CORPORATION, RESPONDENT.

No. 3373

February 11, 1943. 134 P. (2d) 99.

*H. R. Cooke,* of Reno, for Appellant.

*Thatcher & Woodburn,* and *William J. Forman,* all of Reno, for Respondent.

## OPINION

By the Court, DUCKER, J.:

Appellant, who was plaintiff below, and will be so called, commenced this action to recover from the First National Bank of Nevada, a banking corporation, the sum of $23,000 alleged to have been received by the bank to and for his use. The bank disclaimed any interest in the money except as to an escrow fee of $275, and on its motion, John C. Fugitt was substituted as defendant. The $23,000 was deposited with the clerk of the court.

Fugitt filed an answer admitting that the $23,000 was received by the bank and denying that it was received to and for the use of plaintiff. The answer set up a separate and affirmative defense to the complaint and prayed that the $23,000, less an escrow fee to the bank and any indebtedness that may have existed against defendant's business on the 18th day of September 1941 be paid to the defendant.

Plaintiff filed a reply denying the principal allegations of the affirmative defense and setting up his version of the case as against those allegations. The reply also asked that The Barn, Inc., a corporation, be made a party to the action.

Judgment was entered in favor of the defendant. The

case is here on appeal from the judgment and order denying plaintiff's motion for a new trial.

In December of 1940 one Walter Oswald and defendant John C. Fugitt acquired a lease on the premises located at 207 North Center Street, Reno, Nevada. The lease was for ten years and carried a rental value of $460 per month, of which four months rental was paid in advance. It provided that the lessees might assign the entire lease to any corporation which might thereafter be formed by the lessees and might sublet concessions on the demised property, but in no event could any assignment or subletting relieve lessees from their full compliance with the terms and provisions of the lease agreement.

Soon after the lease was obtained, Oswald and defendant organized a corporation known as "The Barn, Inc." The incorporators were Oswald, the defendant, and the latter's attorney, George S. Green. In consideration of the transfer of the said lease to the corporation as payment for 501 shares of the stock, Oswald and defendant were to have 250 shares of the stock issued to each, and Green one share of stock. The lease was never actually assigned to the corporation until September 24, 1941. The corporation was used by Oswald and defendant for carrying on a business at said 207 North Center Street, known as "The Barn Club." The business consisted of running a saloon and the operation of gambling games and slot machines.

In June 1941 defendant acquired all of Oswald's interest in the business of "The Barn Club." Oswald assigned his interest in said lease to the former. At a meeting of the board of directors of The Barn Inc., it appearing that none of the stock theretofore authorized to be issued to Oswald had ever actually been issued, the directors then consisting of defendant, George S. Green, and W. J. Albert, authorized the issuance of all of the stock to defendant. So, in July 1941, defendant was the sole owner of the lease, all of the stock of the corporation and all of the equipment and business of

the Barn Club at 207 North Center Street. In the latter part of July or first part of August 1941, defendant entered into an agreement with O. Micheletti, the plaintiff, whereby plaintiff operated and took 75% of the proceeds of the gambling and 25% of the proceeds of the slot machines at The Barn Club. The slot machines, however, were operated by defendant, as was the bar. Shortly after plaintiff commenced operating the gambling games under this agreement he and defendant commenced to negotiate for the purchase by plaintiff of The Barn business, the lease, equipment, and personal property located on the premises. Pursuant to these negotiations, plaintiff, on September 18, 1941, paid to defendant's bookkeeper, J. E. Armstrong, $1,000 and received back a receipt, which was introduced in evidence, and reads:

"September 18, 1941

Received from O. Micheletti One Thousand Dollars, as deposit on purchase of Barn assets as agreed on and listed (Purchase price of $24,000.00) Bal. $23,000.00 being due and payable 9/23/41.

The Barn

$1000.00                    J. E. Armstrong"

According to the testimony of defendant and his attorney George S. Green, they met with plaintiff in the attorney's office on September 24, 1941, and the attorney dictated an agreement which was agreeable at the time to plaintiff and defendant, which was later reduced to writing and signed by defendant, but was never signed by plaintiff. The agreement provided plaintiff was to pay $13,000 to defendant upon the deposit in escrow of 7,000 shares of The Barn, Inc., stock and to pay the balance of $10,000 which was also to be held in escrow by the First National Bank of Nevada for 15 days to secure any indebtedness against The Barn, Inc., and that if no indebtedness appeared within the 15-day period, after the escrow had been established, the bank should be instructed to deliver the $10,000 to defendant.

This transaction was denied by plaintiff. However, on September 24, 1941 (and according to Green immediately after he dictated that agreement), Green and plaintiff went to said First National Bank and plaintiff deposited with the Trust Department of the bank the sum of $23,000 and took a receipt for it from the assistant cashier and escrow officer, which reads:

"Main Branch No. (——)

"Escrow No. 305.          9–24–19 ——— No. 1085

"Received from O. Micheletti $23,000.00—Twenty Three (thousand) & 00/100 Dollars.

"Together with On a/c Escrow in connection with above numbered escrow.

"First National Bank in Reno
"Trust Department
"R. O. Kwapil
"Assistant       Cashier-Escrow
Officer."

On the 18th of September 1941, after paying the $1,000, plaintiff took possession of The Barn Club and was so in possession at the time of the commencement of this action on October 14, 1941. When he went into possession he took defendant's money out of the slot machines and cash register, and returned it to defendant, replaced the same with his money, took over the stock of liquor and incidentals, glassware, etc., behind the bar and in the liquor room, called up the radio operator and asked that the ad be changed to Micheletti as sole owner, and has during that time received all the receipts from the slot machines, bar and gambling games. On October 1, 1941, defendant deposited with the bank 7,002 shares of the capital stock of The Barn, Inc., duly endorsed, an assignment of Oswald's interest in the lease to himself, an assignment from himself to the corporation of the lease, a bill of sale to The Barn, Inc., of all personal property involved in the alleged deal, the agreement prepared on September 24, 1941, the stock record book of The Barn, Inc., and the seal of

The Barn, Inc., with instructions to the bank that these documents were to be delivered to plaintiff and that the money on deposit was to be paid, $13,000 to defendant, and the balance held until the expiration of the 15-day period and then the balance to defendant. Shortly after October 6, 1941, plaintiff demanded that the $23,000 be returned to him. This demand was refused.

Two agreements are alleged in the affirmative defense, the first of which is that on the 18th day of September 1941 plaintiff agreed to buy from defendant and defendant agreed to sell to plaintiff and deliver or cause to be delivered possession thereof to him on that date, the property and assets of the business known as "The Barn Club" located at 207 North Center Street, Reno, Nevada, excluding cash on hand and clear of debts, for the sum of $25,000, payable as follows: $2,000 cash on said date and $23,000 on or before the 24th day of that month. In connection with this agreement it is alleged that pursuant thereto defendant did on the 18th day of September 1941 deliver such possession to plaintiff who, ever since up to the commencement of this action has held said possession and operated said business. Further, in connection with said agreement, defendant alleged that on the 18th day of September 1941 plaintiff paid to him $1,000 in cash, and the further sum of $1,000 by a credit for certain equipment to be reconveyed by plaintiff.

The second agreement alleged in the affirmative defense is that prior to said 24th day of September plaintiff requested that in lieu of the transfer of title to said property assets and business to him individually, that defendant transfer the same to The Barn, Inc., the corporation herein mentioned, and that defendant transfer the outstanding stock of said corporation consisting of 7,002 shares as follows, to wit: 7,000 shares to plaintiff and 2 shares to plaintiff's nominees, to wit: 1 share to James Harvey and the remaining share to Louis Swift, and that they did at that time agree that plaintiff would deposit with the Trust Department of the First

National Bank of Nevada at Reno, Nevada, the balance of the purchase price of the property, to wit: The sum of $23,000 for the use and benefit of defendant; $13,000 of which was to be paid to defendant upon his deposit in escrow with said bank of the outstanding stock of said "The Barn, Inc." as aforesaid, and the balance of said amount, to wit: the sum of $10,000 to be held by said bank for a period of 15 days as security for any indebtedness that might appear against said business, which indebtedness defendant agreed to pay from said $23,000 due or owing as of September 18, 1941.

Further allegations show compliance with said second agreement by both plaintiff and defendant and that subsequent to said deposit of said $23,000 as aforesaid, plaintiff requested said bank not to deliver the same to defendant but to return the same to plaintiff.

The court found in favor of these agreements and these allegations. A painstaking review of the evidence convinces us that there is substantial evidence in the record to support such findings. The evidence is quite voluminous and to set out even substantially our review of it would prolong this opinion to a great length and serve no useful purpose. In our consideration of the evidence we have given due regard to the opportunity of the trial court to judge of the credibility of the witnesses. We will therefore refer to no more of the evidence than is necessary to explain our rulings on the questions of law raised by the assignment of errors. While the answer alleges two agreements, and for convenience we will speak of them as such, the evidence on which the trial court based its judgment, discloses one entire transaction with merely a change effected by the second agreement in the manner of performance.

■ The first assignment of error, that the court erred in finding that the contract made on September 18, 1941, was between defendant and plaintiff, and not between plaintiff and The Barn, Inc., is disposed of by our conclusion as to the sufficiency of the evidence. Plaintiff stresses the receipt for the $1,000 signed "The Barn by

J. E. Armstrong" as conclusive evidence that the contract was between plaintiff and The Barn, Inc. There is no merit in this contention. The evidence shows that The Barn was merely a name for defendant's business and place of business, and that Armstrong was defendant's bookkeeper. Moreover, Armstrong testified that the transaction in which the $1,000 was paid was between plaintiff and defendant.

The further contention that his testimony and other testimony showing that the contract was between the parties was inadmissible to vary the terms of the receipt is likewise devoid of merit for the simple reason alone that there was no variance.

■■ The next assignment of error is that the trial court erred in finding that because of the alleged fact that respondent owned all or nearly all of the stock of The Barn, Inc., the corporate entity might be disregarded. The findings referred to by plaintiff under this heading are findings III, VII, VIII, IX, and X. We have examined them. They do not bear out the contention that the court disregarded the corporate entity in its findings. The trial court simply found that the first contract and the subsequent contract concerning the stock of the corporation, was between the plaintiff and defendant. It so found, and was entitled to find independently of the corporation. The evidence concerning the corporation was such that under authorities cited by defendant the court was not bound to make any finding that the corporation owned all its stock and all the business that plaintiff was bargaining for—the lease and all the personal property. They dealt as individuals. Under such circumstances the court will not strain after technicalities to defeat the intention of the parties, but will look to the substance of the matter. United States Gypsum Co. v. Mackey Wall Plaster Co., 60 Mont. 132, 199 P. 249; Sargeant v. Palace Cafe Co., 175 Cal. 737, 167 P. 146.

Employing in part the language of the court in the former case, the business of the corporation was in

fact the business of defendant, and vice versa. The corporation, although maintaining the form of legal existence, was, in effect, merely the name under which defendant was doing business. This fact was known to plaintiff, for it appears from the evidence that he wished to continue the business by use of the corporation so as to save the inconvenience and expense of taking out new licenses. He was not deceived in any way, but understood and approved the use of the corporation in the business. The Nevada cases cited by plaintiff have no application to a situation of this kind.

■ The third assignment of error is that the court erred in holding that the agreements were not within the statute of frauds. The statute relied on, sec. 1543 N. C. L. had no application for the reason that the evidence on which the court based its findings shows that they were fully executed on the one side at least, and the buyer put into the possession of the property. Such agreements are not within the statute as appears from its express terms and conceded by all authorities. 2 Page on the Law of Contracts, sec. 1356, and cases cited in note one thereto; 27 C. J. 233; Huntley v. Huntley, 114 U. S. 394, 5 S. Ct. 884, 29 L. Ed. 130.

In said section 1356 the author says: "By the terms of this section of the statute, acceptance and actual receipt of part or all of the personalty sold is sufficient to make the contract enforceable, without a written memorandum or a payment of part of the purchase price or earnest. Accordingly the statute does not apply where there has been either full performance, or receipt and acceptance of part of the personalty sold."

But plaintiff contends a purchaser of corporate shares, taking possession of the assets of the corporation, is not "receipt and acceptance" by the purchaser. He cites Ford v. Howgate, 106 Me. 517, 76 A. 939, 29 L. R. A., N. S. 734, and De Nunzio v. De Nunzio, 90 Conn. 342, 97 A. 323, in support of this position. The latter is easily distinguishable from the facts of the instant case, and the former is against plaintiff's contention. In Ford

v. Howgate, the court held that an oral contract to sell corporate stock was taken outside the statute of frauds by the buyer entering management of the corporate business as an owner. The same principle was applied to similar facts and Ford v. Howgate approved in Pugh v. Gressett, 136 Miss. 661, 101 So. 691, 38 A. L. R. 678. Other cases are presented in defendant's brief which illustrate the principle governing in a situation of this kind. We cite them without comment. Davis Laundry & Cleaning Co. v. Whitmore, 92 Ohio St. 44, 110 N. E. 518; Mahoney v. Kennedy, 172 Wis. 568, 179 N. W. 754.

In the course of its opinion in Ford v. Howgate, supra [106 Me. 517, 76 A. 941, 29 L. R. A. (N. S.) 734], the court said: "* * * We think the decisions will be found substantially harmonious in support of the rule that when it appears from evidence, in addition to that which establishes the contract itself, that something was done with respect to the subject-matter of the contract, either concurrent with or subsequent to it, which unequivocally indicates that there was a delivery by the vendor, with an intention of vesting the right of possession of the subject-matter of the sale in the vendee as owner, and an acceptance and receipt of the same by the latter, with an intent thereby to become the owner thereof, then the contract is so far executed that the statute of frauds does not apply to it."

In the instant case everything was done that evidences intention to transfer ownership of the business. As previously stated, the evidence accepted by the court shows that when plaintiff paid the $1,000 he entered full possession of the Barn Club its equipment and facilities, and operated it all exclusively as his own, receiving the receipts therefrom, and was so doing when this suit was instituted.

■■ Error is claimed in admitting in evidence the written agreement of September 24 changing the manner of performance to a transfer of defendant's shares of stock in the corporation, but there was none. The claim is based on the fact that the writing was not

signed by plaintiff. However, the evidence on which the court found for defendant discloses that plaintiff assented to it at the time it was dictated, deposited the $23,000 in escrow pursuant to its terms and operated under it for some time before repudiating the contract. Under such circumstances the writing was admissible as evidence of the agreement concerning the transfer of stock. Babbitt v. Central Life Ins. Co., 93 Kan. 564, 144 P. 837; Sanders et al. v. Pottlitzer Bros. F. Co., 144 N. Y. 209, 39 N. E. 75, 29 L. R. A. 431, 43 Am. St. Rep. 757; Cohn v. Plumer, 88 Wis. 622, 60 N. W. 1000. Held in the latter case: "Where a complete contract was made orally, the fact that it was expected that a written contract would afterwards be signed, embodying the terms of the oral contract, does not prevent the oral contract from taking effect."

The law did not require the agreement to be in writing and the evidence discloses a concluded agreement before it was reduced to writing.

■ There was no error committed by the court in not ordering The Barn, Inc., to be made a party. The contract was between plaintiff and defendant. The corporation was therefore not a proper party.

It is next claimed that the trial court erred in holding that the stock certificates were in a deliverable state, even though no revenue stamps were affixed thereto at the time of their deposit with the bank.

■ We see nothing meritorious in this claim. At the time the certificates of stock were deposited with the bank for delivery to plaintiff, the bank was instructed in writing by defendant to deduct from the balance to be paid him on the deal, the amount of revenue stamps necessary to cover the transfer of the stock certificates to plaintiff. This was a substantial compliance with the revenue statute requiring the affixing of revenue stamps on the transfer of stock, and would meet any merit there might be in the objection that the certificates of stock were not in a deliverable state by reason of provisions of the uniform sales act of this state.

■ On the other hand, if no revenue stamps had been affixed to the certificates there is nothing in the revenue law that would affect their validity, or the validity of the transfer. Congress has elected to rely on other means for enforcing the stamp provision. Cole v. Ralph, 252 U. S. 286, 40 S. Ct. 321, 64 L. Ed. 567.

We have examined the other errors assigned and find them to be devoid of merit. The contentions of error throughout are largely of a technical nature. The escrow itself and even the testimony of plaintiff refute the assertion of the complaint that the $23,000 was received by the bank to and for his use.

■ The evidence in the main discloses that a contract was entered into between the parties for the sale and purchase of The Barn property, including an assignment of the lease to the buyer, for the sum of $24,000. On cross-examination, in putting in his case, plaintiff was compelled to admit that the $23,000 was placed "there for safe keeping pending the lease—the Barn Club lease—and Mr. Fugitt and I agreed upon that he would drop off the lease." The only sharp issue made in the evidence in this regard seems to be in respect to the assignment of the lease. It is plaintiff's contention that the whole deal depended upon whether the lease could be assigned with defendant eliminated therefrom as a guarantor of the monthly rent payments. Efforts to obtain the consent of the lessors to such elimination failed, and the lease was finally assigned without it. The evidence is sufficient to sustain the lower court in finding that plaintiff was willing that the assignment should be made with defendant remaining responsible for the rent payments.

The judgment and order denying the motion for a new trial should be affirmed.

It is so ordered.