W. F. MARSH, PETITIONER, ET AL.,[1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 17539, 17548, 17693, 17703, 17704. Promulgated June 17, 1949.

---

[1] Proceedings of the following petitioners are consolidated herewith: Donald D. Wolff and Jane S. Wolff; Christine M. Lucas; Virginia J. Simon; and Israel A. Simon.

*J. Marvin Haynes, Esq.*, for the petitioners.
*A. W. Dickinson, Esq.*, for the respondent.

OPINION.

BLACK, *Judge*: In these consolidated proceedings the Commissioner determined deficiencies in the income taxes of the petitioners for the calendar years 1943 and 1944, as follows:

| Petitioner | Docket No. | Deficiency | |
| --- | --- | --- | --- |
| | | 1943 | 1944 |
| W. F. Marsh | 17539 | | $5,702.74 |
| Donald D. Wolff and Jane S. Wolff | 17548 | $103.19 | 2,526.86 |
| Christine M. Lucas | 17693 | | 4,727.98 |
| Virginia J. Simon | 17703 | 2,172.91 | 6,519.29 |
| Israel A. Simon | 17704 | 7,790.80 | 4,416.28 |

The deficiencies are due to several adjustments in petitioners' net incomes as disclosed by the returns for the years involved. By appropriate assignments of error petitioners contest these adjustments. Petitioners have either abandoned, conceded, or stipulated to an adjustment of all but one of the issues involved. This leaves for our consideration the contested adjustment for the year 1944; i. e., whether the sale of certain corporate stock on May 23, 1944, is to be considered a short term capital gain, as contended by respondent, or a long term capital gain, as contended by petitioners. This particular adjustment is explained in the deficiency notice addressed to petitioner W. F. Marsh, as follows:

(a) It is determined that the 500 shares of no par value common stock of the United Tube Corporation which you received as additional consideration for your $5,000 participation in the $65,000 loan made in 1943 to that corporation, were not acquired by you in 1943 (as reported in your Federal income tax return for 1944) but were acquired subsequent to February 23, 1944; that such shares had no value at the date on which you acquired them; and that therefore the entire proceeds of the sale thereof in 1944 constituted income for that year 100% taxable.

The facts have been stipulated and are adopted as our findings of fact. They may be summarized as follows:

Petitioners are individuals, and they filed their respective income tax returns with the collector for the twenty-third district of Pennsylvania. For all taxable years relevant to these proceedings the petitioners kept their books and filed their respective income and vic-

tory tax returns for the calendar year and on the cash basis of accounting.

On May 23, 1944, petitioners were the owners of and sold the following respective number of shares of common stock of the United Tube Corporation and received therefor the following amounts:

| Petitioner | Shares | Price received |
|---|---|---|
| W. F. Marsh | 500 | $10,000 |
| Donald D. Wolff and Jane S. Wolff | 500 | 10,000 |
| Christine M. Lucas | 1,000 | 20,000 |
| Virginia J. Simon | 500 | 10,000 |
| Israel A. Simon | 500 | 10,000 |

The cost basis of the shares of stock sold by petitioners on May 23, 1944, is zero and petitioners realized a capital gain in the respective amounts of the total price each received for the shares of stock sold. Petitioners acquired ownership of their respective shares of common stock of the United Tube Corporation through an agreement made by petitioner Israel A. Simon, acting as agent for all the petitioners, with the United Tube Corporation.

On or about August 24, 1943, petitioners proposed to form a group of individuals to associate for the purpose of participating in rendering financial assistance to United Tube Corporation, a Pennsylvania corporation (hereinafter sometimes called the corporation) engaged in business at Elwood City, Pennsylvania. On August 24, 1943, petitioner I. A. Simon addressed a letter to each of the prospective members of the participating group, outlining a plan for proposed financial assistance to the corporation. The plan contemplated that the participating group lend about $50,000 to the corporation for the purpose of liquidating debts at 20 cents on the dollar; that a so-called V-loan of $300,000 would be obtained for the corporation; that the participating group should receive for each $5,000 of participation in their loan not only a note from the corporation for $5,000, but also 500 shares of common stock. Conforming to the above plan, by October 14, 1943, petitioners and other individuals, acting through petitioner I. A. Simon as agent, had loaned the corporation the sum of $65,000. Petitioners furnished the following respective amounts thereof:

W. F. Marsh _____ $5,000
Donald D. and Jane S. Wolff _____ 5,000
Christine M. Lucas _____ 10,000
Virginia J. Simon _____ 5,000
Israel A. Simon _____ 5,000

The loan of $65,000 was in the form of a checking account with the Peoples-Pittsburgh Trust Co. designated as "United Tube Special

Account, I. A. Simon, agent." Petitioners and their associates agreed with the corporation that their loan in the total amount of $65,000 should be subordinate to a loan in the amount of $300,000 which was made to the corporation by the Peoples-Pittsburgh Trust Co. on October 18, 1943, and a subordination agreement was executed on October 14, 1943.

On or before October 14, 1943, the corporation agreed, in consideration of the loan of $65,000 and its subordination to the above mentioned loan made by Peoples-Pittsburgh Trust Co., to deliver to the petitioners and associates: (1) Promissory notes in the total amount of $65,000, bearing interest at the rate of 5 per cent per annum, and (2) 6,500 shares of no par common stock to be issued when authorized by the corporation, the shares to be dated October 14, 1943.

At a meeting of the board of directors of United Tube Corporation on October 16, 1943, the president reported "the receipt from I. A. Simon and his associates of the money which was being advanced by them and notes dated October 14, 1943 had been delivered therefor."

The president further stated "that there remained to be delivered to the noteholders 6,500 shares of the new common stock of the Company out of the 10,000 shares into which all of the issued and outstanding stock is to be exchanged, such stock when authorized to be issued dated Oct. 14, 1943." The minutes of that meeting were approved, ratified, and confirmed at a meeting of the shareholders on November 20, 1943.

Prior to October 16, 1943, 642⅔ shares of $100 par value common stock of the United Tube Corporation were held by the Colonial Trust Co. of Pittsburgh under a voting trust agreement pending settlement of the corporation's substantial and past due indebtedness to certain creditors. On October 19, 1943, the 642⅔ shares of $100 par value common stock of United Tube Corporation released from the voting trust by reason of the payments to the creditors were delivered to the corporation by the Peoples-Pittsburgh Trust Co. There were also delivered to the corporation on the same date the 99⅓ shares of common stock and the 385 shares of preferred stock which had been purchased between September 8 and October 15, 1943, through disbursements from the account designated "United Tube Special Account, I. A. Simon, agent" which became the property of the corporation.

By October 19, 1943, the United Tube Corporation had acquired all its outstanding capital stock, consisting of 742 shares of $100 par value common stock and 385 shares of $100 par value preferred stock for the purpose of canceling such stock and issuing in its stead 10,000 shares of new no par common stock, 6,500 shares of which were to be issued to petitioners and their associates and 3,500 shares of which were to be issued to G. Warren Wattles, Jr., and H. Clay Stier, the beneficial owners of 642⅔ shares of the common stock.

On November 18, 1943, the United Tube Corporation issued two certificates of stock ownership to petitioner I. A. Simon, acting as agent for all petitioners and others, as follows: Certificate No. P4, for 385 shares of $100 par value preferred stock, and certificate No. C1, for 742 shares of $100 par value common stock. These certificates represented all the issued and outstanding shares of capital stock of the corporation on that date. The foregoing stock was voted by petitioners and their associates through petitioner I. A. Simon, acting as their agent at all times thereafter until the issuance of the 6,500 shares of new no par common stock.

On November 20, 1943, the board of directors of the United Tube Corporation met and approved a recommendation that the necessary steps be taken to amend the articles of incorporation to permit the issuance of 10,000 shares of stock without nominal or par value, but with a stated value of $10 per share. The board of directors further approved the recommendation that all issued and outstanding common and preferred stock of the corporation consisting of 742 common shares and 385 preferred shares be reclassified, converted, and exchanged into 10,000 shares of stock without nominal or par value, but with a stated value of $10 per share; that there be issued when authorized to I. A. Simon and his associates, the noteholders, 6,500 shares of new no par stock and to Wattles and Stier 3,500 shares of such new no par stock in exchange for 642⅔ shares of common stock beneficially owned by them.

In February 1944 the articles of incorporation were amended, pursuant to the resolutions of the board of directors adopted on December 18, 1943, to give the corporation permission to issue 10,000 shares of common stock without nominal or par value, but with a stated value of $10 per share. On February 26, 1944, the United Tube Corporation issued its stock certificate to "I. A. Simon, agent," acting for all petitioners and others, for 6,500 shares of no par value common stock and received from petitioner I. A. Simon, acting as agent for all petitioners and others, stock certificates for 385 shares of $100 par value preferred and 742 shares of $100 par value common, which certificates were thereupon canceled. Thereafter, upon the instruction of petitioner Israel A. Simon, acting as agent for petitioners and their associates, the United Tube Corporation canceled the stock certificate for 6,500 shares of no par value common stock theretofore issued to him and issued to petitioners individual stock certificates dated October 14, 1943, in the following amounts:

| | |
|---|---|
| W. F. Marsh | 500 shares |
| Donald D. Wolff and Jane S. Wolff | 500 shares |
| Christine M. Lucas | 1,000 shares |
| Virginia J. Simon | 500 shares |
| Israel A. Simon | 500 shares |

Respondent determined that the shares of no par value common stock of the United Tube Corporation which petitioners received as additional consideration for participating in the $65,000 loan made in 1943 to the corporation were acquired subsequent to February 23, 1944, and that therefore the entire proceeds of the sale thereof in 1944 constituted income for that year taxable 100 per cent.

There is but one issue to decide in these proceedings, and that is whether the respondent erred in treating the gain from the sale of the stock on May 23, 1944, as a short term capital gain under section 117 (b) of the Internal Revenue Code. Section 117 (b) of the code is printed in the margin.[2]

Petitioners contend that the sale of stock on May 23, 1944, represents a long term capital gain because they held the stock for more than six months. In support of this contention petitioners rely principally on the cases of *I. C. Bradbury*, 23 B. T. A. 1352; affd., 78 Fed. (2d) 599; and *Commissioner* v. *Sporl & Co.*, 118 Fed. (2d) 283, affirming 40 B. T. A. 829. In the *Bradbury* case the taxpayers entered into a contract on April 1, 1920, with a corporation whereby it was agreed that "as soon as it is deemed feasible and advisable to do so by the Corporation and its counsel, the Corporation shall be reorganized  *  *  *." The agreement also stated that:

In the meantime pending the completion of the reorganization which may be an indefinite length of time, the property rights in the Corporation of all parties are hereby determined and fixed in accordance with the rights as they would have existed respectively in case the reorganization had become effective as of April 1, 1920, and the property rights in the Corporation belonging to both the Old and New Stockholders shall be precisely as though the Corporation hereinafter defined and provided for had been completed and the stock issued as of April 1, 1920, and the rights of all parties from and after that date are defined and limited by this agreement.

We held on these facts that immediately upon the execution of the contract the taxpayers each became the beneficial owners of their contract shares of stock precisely to the same extent as if the so-called reorganization had been effected on that date, and a stock certificate issued to each petitioner for the interest given him. The fact that the contemplated reorganization was not effected on said date and stock certificates issued to petitioners was immaterial.

In the *C. A. Sporl & Co.* case, *supra*, the taxpayer was an open account creditor of the Jahncke Co. Jahncke, being in financial

---

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

   *      *      *      *      *      *      *

(b) PERCENTAGE TAKEN INTO ACCOUNT.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

100 per centum if the capital asset has been held for not more than 6 months;
50 per centum if the capital asset has been held for more than 6 months.

difficulty, offered to pay its creditors 20 cents on the dollar in cash and to issue 6 per cent second mortgage bonds for the balance of the indebtedness. Taxpayer accepted the offer and on October 13, 1931, received the cash payment with the understanding that Jahncke would issue bonds for the balance. In February 1932 taxpayer received the bonds. On December 26, 1933, it sold a part of the bonds for less than face value and claimed a loss from the sale of capital assets. At that time section 101 (c) (8) of the Revenue Act of 1932 defined "capital assets" as "property held by the taxpayer for more than two years  *  *  *." The Commissioner determined that the taxpayer had held the bonds only from the date of their issuance and delivery to taxpayer in February 1932. The taxpayer contended the holding period ran from date of its acceptance of Jahncke's offer on October 13, 1931. This Court and the Fifth Circuit ruled that the holding period of bonds commenced on October 13, 1931, the date the debtor agreed that bonds would be issued. The Circuit Court said:

The holding period for the purpose of Section 101 (c) (8) begins to run from the time the bonds were acquired by the taxpayer. *McFeely* v. *Commissioner* 296 U. S. 102, 56 S. Ct. 54, 80 L. Ed. 83, 101 A. L. R. 304. On October 13, 1931, more than two years prior to the sale of the bonds, Sporl & Company relinquished its rights as a general creditor of Jahncke Dry Docks, Inc., and acquired the rights of a second mortgage holder. It accepted the cash payment of $14,235.58, agreed to accept bonds for the balance, and the dry docks company definitely obligated itself to deliver to Sporl & Company second mortgage bonds of the par value of $56,700.00. The rights of the parties became fixed on October 13, 1931, although the bonds evidencing the rights of Sporl & Company were not issued until four months later. It is clear that the assets which were sold in December 1933 by the taxpayer were acquired and held for more than two years prior to their sale, and that they were "capital assets" within the definition of Section 101 (c) (8). *Brewster* v. *Gage*, 280 U. S. 327, 50 S. Ct. 115, 74 L. Ed. 457; *Fordyce* v. *Helvering*,  *  *  *  76 F. 2d 431.

We think that the above decisions are controlling in the instant proceedings. In these proceedings petitioners and their associates entered into an agreement with the United Tube Corporation under which the corporation would receive $65,000 in return for its promissory notes and 6,500 shares of common stock, the stock certificates to be dated October 14, 1943. As of October 14, 1943, petitioners and their associates had fully performed their part of the agreement and all that remained to be done was the authorization and issuance of the common stock to petitioners and their associates.

It is worth noting that on November 20, 1943, at a shareholders' meeting at which all the then outstanding shares of stock were voted, the minutes of the directors' meeting stating the terms of the agreement between petitioners and their associates and the corporation were approved, ratified, and confirmed. There was never any doubt that petitioners and their associates would be the holders of 6,500 shares

of common stock to be issued when authorized and to be dated October 14, 1943. In accordance with the agreement in these proceedings, the stock certificates were to be dated October 14, 1943, by which date the corporation had received the $65,000 and had delivered its promissory notes. No other conclusion can be drawn from the fact that the certificates were to be dated October 14, 1943, than that the parties intended, as in the *Bradbury* case, *supra*, that all rights in the corporation should be established as of a stipulated date. We think it is apparent from the agreement herein that the parties intended to fix the rights of petitioners and their associates as of October 14, 1943.

As used in section 117 (b) of the code, the word "held" is synonymous with ownership. In *McFeely* v. *Commissioner*, 296 U. S. 102, the Court said:

In common understanding to hold property is to own it. In order to own or hold one must acquire. The date of acquisition is, then, that from which to compute the duration of ownership or the length of holding. * * *

The fact that the stock was not formally issued until February 26, 1944, is of no consequence, as a stock certificate merely constitutes evidence of ownership; it is not the stock itself or essential to the ownership thereof. *Richardson* v. *Shaw*, 209 U. S. 365; Fletcher on Corporations, vol. XI, p. 65, sec. 5094.

Respondent argues that the date of ownership or holding period did not commence until the issuance of the stock certificates pursuant to the formal amendment of the corporate charter during February 1944. The cases relied upon by respondent in his brief are distinguishable on their facts. In *Ethlyn L. Armstrong*, 6 T. C. 1166; affd., 162 Fed. (2d) 199, the contract was executory on both sides and hence the holding period did not commence at the inception of the contract. In *Edwin P. Shattuck*, 42 B. T. A. 557; affd., 119 Fed. (2d) 902, we said of the notes there involved, as follows:

* * * They were to remain and they did remain the property of the McDougall-Duluth Co. until May 1, 1934, when it failed to pay its note and the Erie & St. Lawrence notes then became the property of Shattuck, Bangs & Davis to satisfy in full the debt due them. Prior to May 1, 1934, the partnership held the notes as pledgee, not as owner * * *

We hold, therefore, that petitioners and their associates became the beneficial owners of 6,500 shares of stock of the United Tube Corporation on October 14, 1943, the date established by the contract for the dating of the stock certificates, which date appeared on the certificates upon their issuance.

*Decisions will be entered under Rule 50.*