EDWARD H. RUSSELL AND DORIS B. RUSSELL, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 79210. Filed August 8, 1963.

*Alex J. Brunini and C. Delbert Hosemann*, for the petitioners.
*Glen W. Gilson II*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the calendar year 1956 in the amount of $18,499.25.

The issue presented is whether taxable gain is to be recognized upon the exchange by the petitioners of their minority stock interest in one corporation for all of the stock of a second corporation which was, prior to the exchange, wholly owned by the first corporation.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioners are husband and wife whose business address is Vicksburg, Miss. They filed their joint income tax return for the calendar year 1956 with the district director of internal revenue at Jackson, Miss.

The Russell Co., a Mississippi corporation organized and existing since 1921 or 1922, conducted a wholesale grocery business with its principal place of business at Jackson, Miss.

In 1950 and 1951 the petitioners owned 2,896 of the 25,000 outstanding shares of the Russell Co. and their children owned an additional 209 shares thereof, the total amount of 3,105 shares owned by the petitioners and their children representing approximately 15 percent of the total outstanding stock of the Russell Co. At that time Charles H. Russell, the brother of petitioner Edward H. Russell, owned 51 percent of the stock of the Russell Co., was its president, and was the person who actually ran the business. Petitioner Edward H. Russell was then one of its vice presidents, being employed as a buyer and a manager.

The P. P. Williams Co. was a Mississippi corporation organized in 1886, with its principal place of business at Vicksburg, Miss. It was engaged in activities consisting of the conduct of a wholesale grocery business throughout Mississippi, and the operation, under the name of Hill City Mills, of a feed mill, a flour-blending plant, a cornmeal plant, and a seed-processing plant. Substantially all the stock of the Williams Co. was owned by various members of the Fitz-Hugh family. The Fitz-Hughs also owned substantially all the stock of another corporation, the Magnolia Fertilizer Co., but in different proportions from the ownership of the Williams Co.

In September 1944, the Russell Co. purchased a feed mill in Meridian, Miss., which it operated until October 1949, first as a partner-

ship and later as a subsidiary corporation, under the name of Meridian Grain & Elevator Co. This mill was sold in 1949 and thereafter the Russell Co. continued to purchase feed and flour supplies from it under contract, but this arrangement proved to be unsatisfactory. As a result, in 1950 representatives of the Russell Co. commenced negotiations with Alexander Fitz-Hugh to lease the feed mill, as well as the flour-blending, cornmeal, and seed plants, operated by the Williams Co. The parties could not agree on a satisfactory leasing arrangement but at Fitz-Hugh's suggestion they commenced, in the fall of 1950, negotiations with respect to the purchase by the Russell Co. from the Fitz-Hughs of the entire businesses of both the Williams Co. and the Magnolia Fertilizer Co. These negotiations continued until January 15, 1951, when representatives of the Russell Co. and of the Fitz-Hugh family met in Jackson, at which time a proposal was made by the Fitz-Hughs for the sale of all the stock of the two corporations to the Russell Co. The representatives of the Russell Co. took the proposal under consideration, and within a few days B. L. Davis, then vice president of the Russell Co., orally accepted the terms of the Fitz-Hugh's offer on its behalf. This oral agreement was to be reduced to writing and signed by the parties as soon as the attorneys for the parties could prepare the necessary documents and the Russell Co.'s accountant could verify the financial statements of the two corporations as of December 31, 1950.[1]

On March 26, 1951, the shareholders of the Williams Co., individually, and a representative of the Russell Co.,[2] executed a contract and agreement accurately reducing to writing the oral agreement of January 1951 between the parties, whereby the former agreed to sell and the Russell Co. agreed to buy all the stock of the Williams Co. The stated consideration for such shares was $625,000 of which amount $150,000 was to be paid by the Russell Co. in cash on the execution and delivery to it of all the outstanding stock certificates of the Williams Co., properly endorsed, on or before April 30, 1951, and the balance of $475,000 was to be evidenced by registered interest-bearing debentures of the Russell Co., bearing date of April 1, 1951. The written agreement recited that the Russell Co. had paid over to the Fitz-Hughs on March 26, 1951, $5,000 as evidence of good faith, which amount was to be applied toward the cash required to be paid on or before April 30, 1951.

The written contract specifically provided that the sale was contingent upon the furnishing of financial statements by the Russell

---

[1] The accountant for the Russell Co. was not able to send a representative to Vicksburg for the purpose of verification of the Williams Co.'s financial statements until Mar. 28, 1951.

[2] The shareholders of the Russell Co. had approved such contract and agreement a few days prior to the formal execution thereof.

Co.'s accountant showing that the net worth of the Williams Co. and of the Magnolia Fertilizer Co. as of March 31, 1951, was as good as or better than such net worth as of December 31, 1950 (the financial statements as of December 31, 1950, having shown a book value of the Williams Co. of $753,464.22 and a book value of the Magnolia Fertilizer Co. of $91,469.92). It was specifically provided that if the combined net worth of the Williams Co. and of the Magnolia Fertilizer Co. on March 31, 1951, should equal or exceed such combined net worth as of December 31, 1950, then the purchaser bound itself to complete the purchase and acquisition of the stock on or before April 30, 1951; but that if the combined net worth of such companies as of March 31, 1951, should be less than the combined net worth as of December 31, 1950, then the purchaser should have the option to cancel the agreement, in which event the seller was to return the sum of $5,000.

It was also specifically provided that the sale of the stock of the Williams Co. should be contingent upon the purchase by the Russell Co. of all the outstanding stock of Magnolia Fertilizer Co. upon the terms and conditions of a separate agreement of the same date, it being provided that in the event no sale was effected by the Russell Co. of the shares of the Magnolia Fertilizer Co., the instant contract should be void and of no effect, in which case the Russell Co. would be entitled to a return of the $5,000 deposit.

The written contract further provided that the Fitz-Hughs, from and after the date of the contract, should not make any change in the active management of the affairs of the Williams Co.; that they should continue to operate the business in the same manner as it had been conducted in the past; that they should not incur any obligations on behalf of the Williams Co. other than for normal operations without the consent of the Russell Co.; that they should not declare any dividends, increase any salaries, or make any disposition of capital or surplus without written permission from the Russell Co.; and that they should cause to be made an inventory of salable merchandise as of March 31, 1951. The contract permitted the Russell Co. to place one or more representatives in the offices or warehouses of the Williams Co. for observation purposes only, but expressly provided that the Fitz-Hughs would have full supervision and authority in the management of the affairs of the Williams Co. until the stock transfer was completed or the contract terminated.

The balance of the stated consideration, namely, cash of $145,000 and debentures totaling $475,000 (which were dated Apr. 27, 1951, and drawn in favor of the stockholders of the Williams Co. in proportion to their various holdings), was transferred by the Russell Co. on April 17, 1951. On the same date the shares of the Williams Co. were

canceled and reissued to the Russell Co. in one certificate of 7,500 shares. The transaction was one in which gain or loss was recognized to the sellers of the stock of the Williams Co.

The Russell Co. took over actual operation of the Williams Co. on April 1, 1951. Up to that date representatives of the Russell Co. had no authority over the employees of the Williams Co. who were still responsible to its then management, especially Alexander Fitz-Hugh. After April 1, 1951, most of these employees continued to work for the Williams Co., pursuant to an oral agreement of the parties to the sale, under the direction of the Russell Co. Alexander Fitz-Hugh remained with the Williams Co. until July 1951.

The Williams Co. was operated as a wholly owned subsidiary of the Russell Co. from the time of its acquisition until its liquidation on December 31, 1955. The activities of the Williams Co., after the change of ownership, continued as before. Davis set up the Williams Co. into departments and supervised its operations, relying upon its former key employees for the carrying on of the business. In February 1954, petitioner Edward Russell was sent to Vicksburg to manage the operations of the Williams Co. and the business of the Magnolia Fertilizer Co., because such operations were losing money. Thereafter the Williams Co. used the same trucks, equipment, office, and personnel for the conduct of both the grocery business activities and the business activities conducted under the name of Hill City Mills. The operations were in separate, but adjacent, buildings. Separate invoices were used to identify the purchases and sales in connection with the Hill City Mills activities from those of the wholesale grocery activities and separate profit and loss statements of these operations were kept for analysis purposes.

The petitioner Edward Russell and his brother, Charles Russell, did not agree on the management of the Russell Co., and for several years prior to December 31, 1955, the petitioners sought a means of separating their and their children's interests from the Russell Co. To accomplish this end, they, individually, and Petitioner Doris Russell as guardian of the petitioners' minor children, on the one hand, and the Russell Co., by its representatives, on the other hand, executed a written agreement on December 22, 1955.[3] Therein it was recited that the Russell Co. would liquidate the Williams Co. on or about December 31, 1955, that it would set up a new corporation, to be known as the P. P. Williams Co., and that it would transfer to such new corporation on December 31, 1955, certain listed assets and inventory of the old Williams Co. constituting a complete wholesale ware-

---

[3] The execution of this agreement by the representatives of the Russell Co. was approved by a resolution of its board of directors passed at the regular meeting of such board on Dec. 27, 1955, the minutes of which were certified on Mar. 16, 1956.

house and distribution business. It was therein agreed that the petitioners would transfer to the Russell Co. all their interests in that company, and that the Russell Co. in exchange therefor would transfer on the books of the new Williams Co., on December 31, 1955, all the capital stock of such new Williams Co.

Pursuant to this agreement the subsidiary Williams Co. was liquidated into the Russell Co. on December 31, 1955. The Williams Co. was dissolved pursuant to an order appearing in the records of the Chancery Court of Warren County, Miss., dated January 30, 1956, which provided that all its assets should become the property of the Russell Co. as of December 31, 1955. Pursuant to the agreement the Russell Co., immediately upon the liquidation of the subsidiary Williams Co., organized the new corporation, hereinafter referred to as the new Williams Co., the charter of which was granted and signed by the Governor of the State of Mississippi on December 29, 1955, and filed in the Chancery Court of Warren County on January 4, 1956. The organization meeting of the new Williams Co. was held on December 31, 1955, at which its first officers and directors were elected.

The Russell Co. transferred to the new Williams Co. the real property formerly owned by the old Williams Co. which had been used in the wholesale grocery activities (the deed being dated Dec. 31, 1955, and recorded on Feb. 7, 1956), the fixtures, furniture, machinery, and equipment which had been used in such activities, and so much of the items of inventory, accounts and notes receivable, prepaid insurance, rent, taxes, licenses, termite and insecticide expense, meter deposits, gas, oil, and truck parts inventory as was necessary to make up a total book value, when combined with the other items, of $465,750.[4] This amount was equivalent to the agreed value of the petitioners' stock in the Russell Co. (31,105 shares valued at $150 per share). The other assets owned by the old Williams Co., in particular those relating to the feed, flour, and seed activities operated under the name Hill City Mills, were retained by the Russell Co. and were eventually transferred to the Magnolia Fertilizer Co. The new Williams Co. was formed with 1,000 shares of common stock which, according to its stockbook, were issued to the Russell Co. in one certificate as of December 31, 1955, and canceled as of the same date.

On February 9, 1956, the petitioners transferred all their family's stock in the Russell Co. for all the stock of the new Williams Co. The

[4] The opening balance sheet of the new Williams Co. as of Jan. 1, 1956, reflected total assets with a value of $521,716.15 and total liabilities of $55,966.15. The ending balance sheet of the old Williams Co. as of Dec. 31, 1955, reflected total assets with a value of $1,031,142.21 and total liabilities of $256,641.71, or a net book value of assets over liabilities of $774,500.50, which amount exceeded the net value of the assets of the new Williams Co. as of Jan. 1, 1956, by an amount in excess of $300,000.

new Williams Co.'s stockbook shows stock certificates for its 1,000 shares of stock as being issued as of December 31, 1955, to the petitioners and their children in proportion to the number of shares each held in the Russell Co. The actual transfer occurred during February 1956, and the recording of the stock transfers to the petitioners as of December 31, 1955, represented a backdate. At a meeting of the stockholders of the new Williams Co. on February 9, 1956, the written resignations of its first officers and directors, dated December 31, 1955, were accepted and petitioner Edward Russell, who had resigned as vice president of the Russell Co. on or about January 1, 1956, was elected president.

The exchange between the petitioners and the Russell Co. was treated by the Russell Co. in its records as taking place on January 1, 1956. From and after that date petitioner Edward Russell was in control of the new Williams Co. From January 1956 to the date of the trial in this case the petitioners have actively conducted the new Williams Co. Such company still has its principal office at the same location as did the old Williams Co. and is continuing to engage in the wholesale grocery business and other related businesses. After the petitioners acquired control of the new Williams Co. it did not operate a feed mill or engage in seed processing, but purchased feed for wholesale distributing purposes from the mill formerly operated by the old Williams Co. As permitted by the agreement of December 22, 1955, the new Williams Co. used the various trade names and associated emblems as applied to feed, flour, and meal formerly used by the old Williams Co. By such agreement the petitioners expressly agreed that the Russell Co. had the exclusive right to the name "Russell" in connection with the conduct of a wholesale warehouse and distribution business, and to certain other trade names, trademarks, and emblems. They further agreed not to use the name "Russell" as any part of the trade name of such a business and not to infringe upon the Russell Co.'s rights in such trade names and trademarks in any way. Pursuant to such agreement the petitioners also agreed that they would not establish a wholesale warehouse in Jackson for 10 years. The Russell Co. agreed that it would not establish a wholesale warehouse in Vicksburg for 10 years. It was agreed that either party might conduct a wholesale distribution business at any place or places they might desire, including Jackson and Vicksburg.

In their income tax return for the taxable year 1956, the petitioners included no amount in their gross income on account of the exchange of their stock in the Russell Co. for all the stock of the new Williams Co.

In the notice of deficiency the respondent held that such exchange was a taxable exchange and that the petitioners derived long-term capital gain therefrom in the amount of $74,587.60.

OPINION

The petitioners contend that, under section 355 of the Internal Revenue Code of 1954,[5] no gain or loss is to be recognized to them upon their receipt of all the stock of the new Williams Co., by way of distribution

---

[5] Sec. 355 provides in part as follows:

SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock, or

(ii) distributes to a security holder, in exchange for its securities,

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both * * *

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distribution corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

\*   \*   \*   \*   \*   \*   \*

then no gain shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

(2) NON PRO RATA DISTRIBUTION, ETC.—Paragraph (1) shall be applied without regard to the following:

(A) whether or not the distribution is pro rata with respect to all of the shareholders of the distributing corporation,

\*   \*   \*   \*   \*   \*   \*

(C) whether or not the distribution is in pursuance of a plan of reorganization (within the meaning of section 368(a)(1)(D)).

\*   \*   \*   \*   \*   \*   \*

For purposes of this section (other than paragraph (1)(D) of this subsection) and so much of section 356 as relates to this section, stock of a controlled corporation acquired by the distributing corporation by reason of any transaction which occurs within 5 years of the distribution of such stock and in which gain or loss was recognized in whole or in part, shall not be treated as stock of such controlled corporation, but as other property.

\*   \*   \*   \*   \*   \*   \*

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation * * *, is engaged immediately after the distribution in the active conduct of a trade or business, or

\*   \*   \*   \*   \*   \*   \*

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

from the Russell Co., in exchange for all their stock in the Russell Co.

On brief the respondent states that he does not contend that the transaction was used principally as a device for the distribution of earnings and profits of the Russell Co. or the Williams Co., but that the transaction does not qualify for nonrecognition of gain in that the provisions of that section relating to active businesses have not been satisfied.

Subsection (b) of section 355 provides that subsection (a) shall apply only if the distributing corporation and the controlled corporation are engaged, immediately after the distribution of the stock of the controlled company, in the active conduct of a trade or business. It is further provided that a corporation shall be treated as engaged in the active conduct of a trade or business if, and only if, such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution, such trade or business was not acquired within such 5-year period in a transaction in which gain or loss was recognized in whole or in part, and control of a corporation which (at the time of acquisition of control) was conducting such trade or business was not acquired by another corporation within such 5-year period, or, if so acquired, was acquired in a transaction in which gain or loss was not recognized in whole or in part.

Here the business carried on by the new Williams Co. (the controlled corporation) immediately after the distribution of its stock to the petitioners was the wholesale grocery business which had been conducted by the old Williams Co., a corporation. Control of such old Williams Co. was acquired by the Russell Co., the distributing corporation, in a transaction in which gain or loss was recognized.

The crucial question presented is whether the acquisition by the Russell Co. of control of the old Williams Co. occurred within the 5-year period ending on the date of the distribution to the petitioners of the stock of the new Williams Co. Both the date of the distribution of the stock of the new Williams Co. to the petitioners and the date of acquisition by the Russell Co. of control of the old Williams Co. are in dispute. The petitioners contend that the Russell Co. acquired control of the old Williams Co. as of December 31, 1950, that the stock of the new Williams Co. was distributed to the petitioners as of December 31, 1955, and that hence the date of acquisition of control was not within the 5-year period ending on the date of distribution. The respondent also contends that the date of distribution was December 31, 1955 (or, alternatively, Dec. 22, 1955, the date of the contract between the petitioners and the Russell Co.). He contends that the date of acquisition of control of the old Williams Co. was April 17, 1951, the date of actual receipt by the Russell Co. of the stock of the old Williams Co. (or, alternatively, Apr. 1, 1951,

the date that the Russell Co. took over the operation of the old Williams Co., or Mar. 26, 1951, the date of the written contract between the Russell Co. and the stockholders of the old Williams Co.). He therefore contends that whichever of these dates are taken as the correct dates of distribution and acquisition of control, respectively, acquisition of control occurred within the 5-year period ending on the date of distribution.

Section 355 does not define "the date of the distribution," and neither the congressional committee reports nor the income tax regulations are helpful in this respect. As stated above, both parties primarily argue for the date of December 31, 1955, as the date of the distribution of the stock of the new Williams Co. to the petitioners. That was the date on which the contract of December 22, 1955, contemplated that the stock of the new Williams Co. would be exchanged and transferred to the petitioners on the books of the new company. It was not until February 9, 1956, that the petitioners surrendered their stock in the Russell Co. and actually received certificates of stock in the new Williams Co., but the transfer of the new Williams Co. stock was recorded on the stock record book as of December 31, 1955. In view of our conclusion, *infra*, with respect to the date of acquisition by the Russell Co. of control of the old Williams Co., we find it unnecessary to decide whether, within the meaning of the statute, the date of the distribution of the stock of the new Williams Co. to the petitioners was December 31, 1955. We think it could not reasonably be considered that the date of such distribution was later than February 9, 1956, the date of the actual issuance of the stock certificates to the petitioners.

Section 368(c) of the Code provides that for purposes of part III of subchapter C of chapter 1 of the Code, which contains section 355, the term "control" means the ownership of at least 80 percent of the stock of the corporation.[6] Accordingly, it cannot be considered that the Russell Co. acquired control of the old Williams Co. prior to the date it acquired ownership of the stock of that company.

In the fall of 1950 negotiations were commenced between the Russell Co. and the owners of the stock of the old Williams Co. which continued until January 15, 1951, when the owners of the stock made a proposal for the sale thereof to the Russell Co. Within a few days thereafter the oral contract was accepted by the Russell Co. The oral agreement was reduced to writing and signed on March 26, 1951. At that time an amount of $5,000 was paid by the Russell Co. as evidence of good faith and the remainder of the purchase price was to be paid

---

[6] Sec. 368(c) provides:

(c) CONTROL.—For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

on or before April 30, 1951. The contract provided that the sale of the stock was contingent upon the furnishing of a financial statement showing that the combined book value of the Williams Co. and the Magnolia Fertilizer Co. as of March 31, 1951, was equal to or greater than such combined net worth as of December 31, 1950; should the combined net worth be less on March 31, 1951, than on December 31, 1950, the purchaser would have the option to cancel the agreement and receive back the earnest money. The contract also provided that the sale of the stock was contingent upon the purchase by the Russell Co. of the stock of the Magnolia Fertilizer Co. under the terms of a separate agreement, and it was further provided that if no sale of the stock of the Magnolia Fertilizer Co. was effected, then the contract with respect to the sale of the Williams Co. stock should be void and the Russell Co. would be entitled to a return of its earnest money. The contract further provided that the shareholders of the old Williams Co. would have full supervision and authority in the management of the affairs of the Williams Co. until the stock transfer was completed or the contract terminated. The Russell Co. did not pay the balance of the purchase price for the stock, consisting of $145,000 in cash and debentures totaling $475,000, until April 17, 1951, and it was not until that date that the old shares of the Williams Co. were canceled and reissued to the Russell Co. The Russell Co. took over the actual operations of the Williams Co. on April 1, 1951, its representatives up to that time having no authority over the employees of the Williams Co.

In the circumstances above outlined, we think it must be concluded that the Russell Co. did not acquire ownership of the stock of the old Williams Co., and hence did not acquire control thereof, prior to April 17, 1951, the date on which it received delivery of the stock. Neither the oral contract nor the written contract purported to constitute a contract of sale, and purchase, but were executory contracts to sell and to purchase. See *Ethlyn L. Armstrong*, 6 T.C. 1166, affd. (C.A. 3) 162 F. 2d 199, and cf. *W. F. Marsh*, 12 T.C. 1083.

Furthermore, under section 5359–01 of the Mississippi Code (1942),[7] title to a certificate and to the shares represented thereby can be transferred only by delivery of the certificate endorsed either in blank or to

---

[7] Sec. 5359–01 of the Mississippi Code provides:

Title to a certificate and to the shares represented thereby can be transferred only,

(a) By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or

(b) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby. Such assignment or power of attorney may be either in blank or to a specified person.

The provisions of this section shall be applicable although the charter or articles of incorporations or code of regulations or bylaws of the corporation issuing the certificate and the certificate itself, provide that the shares represented thereby shall be transferable only on the books of the corporation or shall be registered by a registrar or transferred by a transfer agent.

a specified person or by delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign, or transfer the same or the shares represented thereby. In the instant case, there was no delivery of the certificates prior to April 17, 1951. Hence ownership of the stock of the old Williams Co. did not pass to the Russell Co. prior to that date. See *Robert Ginsberg*, 35 T.C. 1148, affd. (C.A. 2) 305 F. 2d 664, which involved an interpretation of the same provisions of the Uniform Stock Transfer Act adopted by the State of New York.

Even if it were considered that, prior to actual delivery of the certificates of stock, the Russell Co. acquired contractual rights which amounted to ownership of the stock of the old Williams Co., we think that such ownership could not be considered as having been acquired before March 26, 1951, the date on which the oral contract was reduced to writing. Up to that time all the parties had was an oral agreement which was unenforceable by reason of the Mississippi Statute of Frauds.[8] We think there can be no doubt that stock is personal property within the meaning of such section. See *Mayaw Canning & Preserving Co.* v. *Cohen*, 135 Miss. 378, 99 So. 896. The price of the stock was in excess of $50, the Russell Co. did not receive any of the stock until April 17, 1951, and it did not pay any of the purchase price until March 26, 1951. There was no note or memorandum in writing of the agreement of sale prior to March 26, 1951. There was no such partial performance of the contract prior to that date as would make the statute of frauds inapplicable. Cf. *Pugh* v. *Gressett*, 136 Miss. 661, 101 So. 691.

It is our conclusion, therefore, that the control of the old Williams Co. was acquired by the Russell Co. within the 5-year period ending on the date of the distribution of the stock of the new Williams Co. to the petitioners.[9] Since such control was acquired in a transaction

---

[8] Sec. 268 of the Mississippi Code (1942) provides:

A contract for the sale of any personal property, goods, wares, or merchandise, for the price of fifty dollars or upward, shall not be allowed to be good and valid unless the buyer shall receive part of the personal property, goods, wares and merchandise, or shall actually pay or secure the purchase money, or part thereof, or unless some note or memorandum, in writing, of the bargain be made and signed by the party to be charged by such contract, or his agent thereunto lawfully authorized.

[9] The petitioners also advanced the argument that the business of the new Williams Co., the stock of which the petitioners received in distribution, was merely a part of a single business which had been conducted by the Russell Co. for a period far in excess of 5 years before the date of the distribution, and that under the principle of *Edmund P. Coady*, 33 T.C. 771, affd. (C.A. 6) 289 F. 2d 490, the active business requirements of sec. 355 have been met. As a basis for such contention the petitioners state on brief that the Russell Co. acquired the old Williams Co. for the purpose of obtaining the feed and flour mill operated by the Williams Co. to replace the feed mill which it had formerly owned and had sold, and that all the assets of the Williams Co. became a part and parcel of the business of the Russell Co., the Williams Co. being purely and simply a part of the Russel Co. We see no merit to this contention. The Russell Co. acquired the stock of a separate corporation. It did not liquidate that corporation, but continued to operate it until Dec. 31, 1955. The business of the Williams Co. did not become an integral part of the business which had been conducted by the Russell Co. before the commencement of the 5-year period.

in which gain or loss was recognized, section 355 of the Code does not apply to render nontaxable the distribution of the stock of the new Williams Co. to the petitioners.

The petitioners on brief also contend that the exchange of all their stock in the Russell Co. for all the stock in the new Williams Co. was pursuant to a plan of reorganization and that such transaction, therefore, is nontaxable under the provisions of section 354 of the Code.[10] They specifically argue that on December 31, 1955, there was a merger or consolidation of the Russell Co. and the old Williams Co. within the meaning of section 368(a)(1)(A) of the Code.[11] They also appear to advance the alternative contention that the transfer by the Russell Co. on December 31, 1955, of some of its assets to the new Williams Co. in exchange for all the stock of the new Williams Co. constituted a reorganization within the meaning of section 368(a)(1)(D) of the Code.[11]

We see no merit in these contentions of the petitioners. The words "statutory merger or consolidation" used in section 368(a)(1)(A) of the Code have reference to a merger or consolidation effected pursuant to the corporation laws of the United States or a State or Territory or the District of Columbia. Sec. 1.368-2(b), Income Tax Regs. There was here no merger or consolidation pursuant to the corporation laws of the State of Mississippi in effect when the old Williams Co. was dissolved and liquidated. Section 5351-01 of the Mississippi Code (1942) which was in effect in 1955 and 1956, provides

---

[10] Sec. 354 provides in part as follows:

(a) GENERAL RULE.—

(1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(b) EXCEPTION.—

(1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—

(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and

(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

[11] Sec. 368 provides in part as follows:

(a) REORGANIZATION.—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

(A) a statutory merger or consolidation;

\*　　\*　　\*　　\*　　\*

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356 \* \* \*

a detailed procedure for the accomplishment of a consolidation or merger, including the filing with the office of the secretary of state of the State of Mississippi of an agreement of merger or consolidation. It further provides that upon the affixing of the seal of the State of Mississippi to the agreement, such agreement thenceforth shall be taken to be the agreement and act of consolidation or merger of the corporation. Here there is no evidence whatever to show compliance with such statute. On the contrary, the parties have stipulated that the subsidiary Williams Co. was dissolved pursuant to an order appearing in the records of the Chancery Court of Warren County. The procedures set forth in the then effective Mississippi Code provisions relating to mergers and consolidations do not mention the county chancery court. On the other hand, the then effective section of the Mississippi Code relating to the dissolution of corporations, section 5352, does provide for a decree by the Chancery Court. All that occurred here was the liquidation and dissolution of the old Williams Co. and the formation of the new Williams Co.

Furthermore, even if the liquidation by the Russell Co. of the old Williams Co. on December 31, 1955, were considered to be a merger or consolidation within the meaning of the Code, it seems clear that the exchange by the petitioners of their stock in the Russell Co. for stock of the new Williams Co. would not be a part of such a merger or consolidation. After liquidating the old Williams Co. the Russell Co. then took part of its assets and transferred them to the new Williams Co. It was after this subsequent step that the petitioners exchanged their stock in the Russell Co. for the stock of the new Williams Co. Clearly such exchange would have to be considered as a part of the subsequent transaction.

As stated, the petitioners also apparently contend that the transfer by the Russell Co. of a part of its assets, namely, some of those obtained upon the liquidation of the old Williams Co., to the new Williams Co. constituted a reorganization within the meaning of section 368(a)(1)(D) of the Code, in that immediately after the transfer the petitioners, who had been stockholders of the Russell Co., were in control of the new Williams Co. However, section 368(a)(1)(D) specifically provides that a transaction does not qualify as a reorganization unless stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356. We have hereinabove held that the transaction does not qualify under section 355. It is also clear that the transaction does not qualify under section 354 inasmuch as that section specifically provides that it shall not apply to an exchange pursuant to a plan of reorganization within the meaning of section 368(a)(1)(D) unless the corporation to which the assets are transferred acquires substantially all the assets of the transferor of such

assets, and the stock received by the transferor, as well as the other properties of the transferor, is distributed in pursuance of the plan of reorganization. In the instant case substantially all the assets of the Russell Co. were not transferred to the new Williams Co., and the Russell Co. did not distribute all its properties in pursuance of a plan of reorganization. Section 356 has no application since it deals with exchanges in which the property received in exchange consists both of property permitted by section 354 or 355 to be received without the recognition of gain and other property or money. Such was not the case here.

It is our conclusion, therefore, that the transaction by which the petitioners exchanged their stock of the Russell Co. for stock of the new Williams Co. was not an exchange in pursuance of a plan of reorganization, and that therefore the nonrecognition of gain or loss provisions of section 354 have no application here to the transaction.

It follows that the respondent did not err in his determination that the petitioners derived long-term capital gain in the amount of $74,587.60 upon the distribution to them of the stock of the new Williams Co.

*Decision will be entered for the respondent.*